# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 02-2655

PURDUE RESEARCH FOUNDATION,

*Plaintiff-Appellant,*

*v.*

SANOFI-SYNTHELABO, S.A.,
SANOFI-SYNTHELABO, INCORPORATED,
and STWB, INCORPORATED,

*Defendants-Appellees.*

———————

Appeal from the United States District Court for
the Northern District of Indiana, Hammond Division.
No. 02 C 4—**Allen Sharp**, *Judge.*

———————

ARGUED DECEMBER 9, 2002—DECIDED AUGUST 4, 2003

———————

Before BAUER, RIPPLE and KANNE, *Circuit Judges.*

RIPPLE, *Circuit Judge.*    Purdue Research Foundation ("PRF"), an Indiana corporation with its principal place of business in West Lafayette, Indiana, filed this action for breach of contract in the Superior Court for Tippecanoe County, Indiana, against Sanofi-Synthelabo, S.A. ("SSBO France"), a French corporation with its principal place of

business in Paris, France.[1] PRF alleged that it was entitled to payments relating to the development of an antiviral drug, known as pleconaril, under a Cooperative Research Agreement that SSBO France had acquired from Sterling Winthrop, Inc. through an asset purchase agreement. Invoking the diversity jurisdiction of the district court, *see* 28 U.S.C. § 1332, SSBO France removed the case to the United States District Court for the Northern District of Indiana.[2]

---

[1] PRF also named Sanofi-Synthelabo, Inc. ("SSBO U.S."), a Delaware corporation with its principal place of business in New York, and STWB, Inc. ("STWB"), a now-defunct Delaware corporation, as defendants. The district court, however, dismissed these defendants for misjoinder, and PRF does not appeal that determination.

[2] In its Notice of Removal, SSBO France asserted that the district court had subject matter jurisdiction over this case pursuant to both 28 U.S.C. § 1332 (diversity of citizenship) and 28 U.S.C. § 1338 (patent construction). The United States Court of Appeals for the Federal Circuit has exclusive jurisdiction over appeals in which the jurisdiction of the district court is based, in whole or in part, on the construction of a patent under 28 U.S.C. § 1338. *See* 28 U.S.C. § 1295(a)(1); *see also Aura Lamp & Lighting, Inc. v. Int'l Trading Corp.*, 325 F.3d 903, 906-07 (7th Cir. 2003). Although the district court's docket therefore reflects that its jurisdiction is based on the existence of a federal question, we note that the proper jurisdictional basis is diversity of citizenship. There is complete diversity of citizenship between the plaintiff and the defendants, and the matter in controversy exceeds the value of $75,000. *See* 28 U.S.C. § 1332. Patent law jurisdiction extends only to those cases in which " 'federal patent law creates the cause of action'" or " 'the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims.'" *U.S. Valves, Inc. v. Dray*, 190 F.3d 811, 813 (7th Cir. 1999)

(continued...)

The district court dismissed PRF's complaint against SSBO France for want of personal jurisdiction. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

PRF is the contracting authority for all sponsored research undertaken at Purdue University. SSBO France is a French corporation in the business of developing, manufacturing and selling pharmaceuticals.

On December 1, 1987, PRF entered into a five-year Cooperative Research Agreement ("Agreement") with Sterling Drug, Inc. ("Sterling Drug") for the purpose of developing certain antiviral drugs.[3] The Agreement acknowledged that Dr. Michael Rossmann and other Purdue scientists had been cooperating with Sterling scientists since January 1,

---

[2] (...continued)

(quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809 (1988)). Because neither situation is present in this case, we have jurisdiction over this appeal.

[3] We focus on the first agreement but note that PRF actually entered into three separate Cooperative Research Agreements with Sterling Drug between December 1, 1987, and December 1, 1992. However, PRF has made no effort to differentiate the later agreements from the 1987 agreement. More importantly, the parties express no disagreement over the fact that research under these agreements is completed, and this litigation solely concerns PRF's claim that it is owed compensation because its research led to a successful product.

1986, that their research had led to an increased under-
standing of the interaction between certain viruses and an-
tiviral agents, and that the parties desired to continue their
relationship in order to further develop antiviral agents of
interest to Sterling Drug. The Agreement obligated Sterling
Drug to compensate PRF for product achievements related
to the sponsored research.[4]

Under the Agreement, PRF and Sterling Drug agreed
to share the cost of their collaborative research efforts, both
contributing $50,000 for each of the five years. Sterling
Drug further agreed to furnish Dr. Rossmann and his asso-
ciates with adequate supplies of picornavirus and other
viruses for research to be performed at Purdue University.
In addition, both PRF and Sterling Drug agreed to provide
the other with an annual written report summarizing the
work carried out under the Agreement by Purdue scientists

---

[4] The Agreement recognized that the collaborative research
could lead to four types of product achievements: (1) joint in-
ventions, (2) inventions made solely by Sterling Drug personnel,
(3) inventions made solely by Purdue University personnel, and
(4) inventions made jointly with third parties. In regard to the
second category, which is at issue in this litigation, the Agree-
ment provided that any invention, which "is conceived or first
actually reduced to practice in the course of work under this
Agreement," and which, "under United States law, is an inven-
tion solely of Sterling personnel, shall be owned by Sterling
alone." R.1, "Cooperative Research Agreement" at ¶ 7.2(b). With
respect to any such invention, the parties agreed "to negotiate in
good faith to determine a percentage that Sterling will pay PRF
based on net sales of any product, the manufacture, use or sale of
which would infringe a claim of an issued, unexpired and
enforceable patent or a published patent application covering one
or more aspects of the invention if the patent or application were
not owned by Sterling." *Id.* at ¶ 9.1.

at the University and by Sterling scientists at Sterling's facilities. Sterling Drug also agreed to indemnify PRF for any liability arising from the manufacture, use, distribution or sale of products by Sterling Drug, its affiliates or licensees. The Agreement provided for the application of Indiana law, but it did not contain a choice of forum clause or a stipulation as to personal jurisdiction in Indiana. Also, the Agreement permitted Sterling Drug to assign the contract to any entity that succeeded to substantially all of Sterling Drug's ethical pharmaceutical business.

By its terms, the research component of the Agreement expired on December 1, 1992.[5] During the period of the Agreement, PRF and Sterling Drug worked on and evaluated various antiviral chemical compounds. According to PRF, this research, which was conducted primarily in West Lafayette, Indiana, contributed to the development of pleconaril, an antiviral drug intended to treat the common cold. On September 20, 1994, Sterling Winthrop, Inc. ("Sterling Winthrop"), the successor to Sterling Drug, was granted a patent for the chemical compound known as pleconaril.[6]

In 1994, the intellectual property relating to Sterling Winthrop's ethical pharmaceutical business was purchased by Sanofi, S.A. ("Sanofi France"), a French corporation, and Sanofi Winthrop, Inc. ("Sanofi Winthrop"), a Delaware corporation and subsidiary of Sanofi France. Relevant to this

---

[5]   Although the Agreement expired on December 1, 1992, Sterling Drug's obligation to compensate PRF for product achievements related to the sponsored research continued.

[6]   The patent application was filed on April 15, 1992. The patent identifies Guy D. Diana and Theodore J. Nitz, employees of Sterling Winthrop, as the lone inventors.

lawsuit, Sanofi France took title to Sterling Winthrop's "pipeline and/or discovery products," which included the intellectual property relating to pleconaril. R.15 at ¶ 7. Sanofi Winthrop obtained title to a different class of Sterling Winthrop's intellectual property relating to "commercial products." *Id.* Sterling Winthrop's other assets, including intellectual property relating to different Sterling Winthrop operations, were purchased by companies other than Sanofi France and Sanofi Winthrop. *See id.*

In 1999, Sanofi France merged with Synthelabo, S.A., another French corporation, and became SSBO France. At the same time, Sanofi Winthrop became SSBO U.S. Following the merger, SSBO France retained all property rights in pleconaril. On February 27, 2001, SSBO France granted ViroPharma, Inc. ("ViroPharma"), a Delaware corporation with its principal place of business in Pennsylvania, an exclusive royalty-bearing license to develop, market and sell pleconaril throughout the United States and Canada. *See* R.21, Ex.G.[7]

In furtherance of the 1987 Cooperative Research Agreement, Sterling Drug regularly shipped research samples to Dr. Rossmann and his associates in Indiana for their analysis. Sterling Drug scientists and employees also made several visits to Purdue's campus in West Lafayette, Indiana, to discuss and evaluate the progress of PRF's research. In addition to physical visits by Sterling Drug personnel, Sterling Drug established and maintained ongoing communications with PRF through the use of mail, telephone, facsimile and other means. There is no evidence, however, that SSBO France, or its predecessor, Sanofi France, physi-

---

[7] This license agreement superseded earlier agreements between Sanofi France and ViroPharma relating to pleconaril.

cally entered Indiana in furtherance of the Agreement or communicated with PRF about the Agreement in any way.

Although SSBO France is in the business of developing, manufacturing and selling pharmaceuticals, it performs none of these operations in the United States. The development, manufacture and sale of pharmaceuticals in the United States under the name of "Sanofi Synthelabo" is undertaken exclusively by SSBO U.S., a wholly-owned subsidiary of SSBO France. Other licensees of SSBO France, including ViroPharma, develop, manufacture and/or sell pharmaceuticals in the United States under the name of the individual licensee. SSBO France does not manufacture or sell any goods in Indiana, does not provide any services in Indiana, does not maintain any offices in Indiana, does not own any real property in Indiana, does not insure any risks located in Indiana and does not employ any persons in Indiana. SSBO France has executed several confidentiality agreements with Eli Lilly, Inc., an Indiana corporation with its principal place of business in Indianapolis, Indiana, but none of these agreements concern pleconaril.

## B. District Court Proceedings

On December 20, 2001, PRF filed this action for breach of contract in the Superior Court for Tippecanoe County, Indiana. PRF alleged that research conducted by Dr. Rossmann and other Purdue scientists under the PRF-Sterling Agreement contributed to the development of certain antiviral drugs, including pleconaril, for which Sterling and/or its successors had received commercial benefits, that SSBO France was the successor-in-interest to Sterling and/or had assumed its obligations under the Agreement, and that PRF was owed payments under the Agreement in connection with the development of plecona-

ril.[8] On January 22, 2002, SSBO France removed the case to the United States District Court for the Northern District of Indiana; and, on February 14, 2002, it filed a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.

On June 5, 2002, after the parties had conducted limited discovery relating to the jurisdictional issue, the district court dismissed PRF's complaint for lack of personal jurisdiction. The court first rejected PRF's argument that SSBO France is subject to specific jurisdiction in Indiana because, as Sterling's predecessor-in-interest, it is bound by Sterling's extensive contacts with Indiana in the formation and performance of the Agreement. *See* R.35 at 4. The court reasoned that, although personal jurisdiction may be imputed to a corporate successor in some instances, "when the predecessor and successor are parties to the assignment of a contract, the assignee does not automatically assume the assignor's contacts with the forum." *Id.* Because SSBO France purchased less than all of Sterling, the court concluded that it could not attribute Sterling's contacts to SSBO France. *See id.*

The district court then rejected PRF's argument that SSBO France's own contacts with Indiana are sufficient to establish the continuous and systematic contacts needed to confer general jurisdiction over SSBO France. *See id.* at 5. Finally, the court rejected PRF's argument that SSBO France is subject to personal jurisdiction under a stream of commerce theory. Because SSBO U.S. and other licensees of SSBO France are responsible for manufacturing and distri-

---

[8] For the purpose of this opinion, there is no significant distinction between Sterling Drug and its successor, Sterling Winthrop. Accordingly, we refer to them hereafter as "Sterling."

buting the products that stem from SSBO France's patents in the United States, the court reasoned that SSBO France does not place any products into the stream of commerce and therefore the stream of commerce doctrine does not apply.

## II

## DISCUSSION

A district court sitting in diversity has personal jurisdiction over a nonresident defendant only if a court of the state in which it sits would have jurisdiction. *See Hyatt Int'l Corp. v. Coco,* 302 F.3d 707, 713 (7th Cir. 2002). Whether an Indiana state court would have jurisdiction over SSBO France usually would require a two-step inquiry. *See Int'l Med. Group, Inc. v. American Arbitration Ass'n, Inc.,* 312 F.3d 833, 846 (7th Cir. 2002). First, we would determine whether the law of Indiana, specifically Indiana Trial Rule 4.4(A), subjects SSBO France to in personam jurisdiction. *See id.*[9] If

---

[9]  Indiana Trial Rule 4.4(A) provides:

> Any person or organization that is a nonresident of this state, a resident of this state who has left the state, or a person whose residence is unknown, submits to the jurisdiction of the courts of this state as to any action arising from the following acts committed by him or her or his or her agent:
>
> (1) doing any business in this state;
>
> (2) causing personal injury or property damage by an act or omission done within this state;
>
> (3) causing personal injury or property damage in this state by an occurrence, act or omission done outside this state if he regularly does or solicits business or engages in
>
> (continued...)

it did, we then would determine whether the exercise of jurisdiction over SSBO France comports with the requirements of federal due process. *See id.* In this case, however, we believe that considerations of judicial economy and prudence justify our pretermitting the first inquiry. Indiana Trial Rule 4.4(A) recently has been amended and, if we

---

[9] (...continued)

> any other persistent course of conduct, or derives substantial revenue or benefit from goods, materials, or services used, consumed, or rendered in this state;
>
> (4) having supplied or contracted to supply services rendered or to be rendered or goods or materials furnished or to be furnished in this state;
>
> (5) owning, using, or possessing any real property or an interest in real property within this state;
>
> (6) contracting to insure or act as surety for or on behalf of any person, property or risk located within this state at the time the contract was made;
>
> (7) living in the marital relationship within the state notwithstanding subsequent departure from the state, as to all obligations for alimony, custody, child support, or property settlement, if the other party to the marital relationship continues to reside in the state; or
>
> (8) abusing, harassing, or disturbing the peace of, or violating a protective or restraining order for the protection of, any person within the state by an act or omission done in this state, or outside this state if the act or omission is part of a continuing course of conduct having an effect in this state.

Indiana Tr. R. 4.4(A). In addition to the enumerated bases for personal jurisdiction, Indiana Trial Rule 4.4(A) now provides that "a court of this state may exercise jurisdiction on any basis not inconsistent with the Constitutions of this state or the United States." *Id.* This amendment became effective on January 1, 2003, while Purdue's case was pending on appeal.

were to address its applicability, we necessarily would be obliged to address the issue of the amended version's retroactivity. Because we have determined that the exercise of jurisdiction in this case would not comport with the requirements of the federal Due Process Clause, we need not, and in our view should not, gratuitously address this question.

## A. Specific Jurisdiction

We turn to the question of whether PRF has demonstrated that there are sufficient minimum contacts between SSBO France, this litigation and Indiana to permit us to say that it is fundamentally fair to require SSBO France to participate in this litigation and to be bound by the judgment of a court sitting in Indiana. This inquiry is the classic formulation of the analytical paradigm for assessing an assertion of specifically affiliating jurisdiction. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292 (1980); *International Shoe Co. v. Washington,* 326 U.S. 310, 316-17 (1945).

In undertaking this analysis, the most helpful case is *Burger King Corp. v. Rudzewicz,* 471 U.S. 462 (1985), because, in the context of the adjudication of contractual rights, it deals with the requisite minimum contacts necessary to hold a nonresident defendant amenable to the jurisdiction of a state court. *Burger King* sets forth both general norms that are important to any minimum contacts analysis and particularized norms that are specific to contract cases.

We turn first to the general norms. In this respect, *Burger King* teaches that the constitutional touchstone in any specifically affiliating jurisdictional analysis is the minimum contacts test annunciated by the Supreme Court of the United States in *International Shoe. See Burger King,* 471

U.S. at 474. As noted earlier, the inquiry here must focus on whether it is fundamentally fair to require the defendant to submit to the jurisdiction of the court *with respect to this litigation. See World-Wide Volkswagen,* 444 U.S. at 292; *International Shoe,* 326 U.S. at 316-17. The Supreme Court consistently has made it clear that, in employing this test, we must focus on the factor of "foreseeability." The fore-seeability that is significant for this purpose is whether the defendant could have anticipated being haled into the courts of the state with respect to the matter at issue. *See Burger King,* 471 U.S. at 474; *World-Wide Volkswagen,* 444 U.S. at 297. Notably, it must be the activity of the defendant that makes it amenable to jurisdiction, not the unilateral activity of the plaintiff or some other entity. *See Burger King,* 471 U.S. at 474; *World-Wide Volkswagen,* 444 U.S. at 298. This require-ment is designed to ensure that the defendant retains sufficient, albeit minimal, ability to structure its activities so that it can reasonably anticipate the jurisdictions in which it will be required to answer for its conduct. *See Burger King,* 471 U.S. at 472. In any given case, there must be some showing that the defendant purposefully availed itself of the privilege of conducting activities within the forum state. *See id.* at 475; *Hanson v. Denckla,* 357 U.S. 235, 253 (1958). This requirement ensures that a defendant's amenability to jurisdiction is not based on fortuitous contacts, but on contacts that demonstrate a real relationship with the state with respect to the transaction at issue. *See Burger King,* 471 U.S. at 475. To this end, the Supreme Court repeatedly has asked whether the defendant has deliberately engaged in significant activities within the forum state, *see Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 781 (1984), *Kulko v. California Superior Ct.,* 436 U.S. 84, 94-95 (1978), or whether it has created continuing obligations between itself and a resident of the forum, *see Travelers Health Ass'n v. Virginia,* 339 U.S. 643, 648 (1950).

It is especially important to note that, although territorial presence may indeed be an important factor in many cases, it is by no means essential. If, for example, a commercial defendant's efforts are directed toward a particular jurisdiction, the fact that the actor did not actually enter the jurisdiction is not of crucial importance. *See Calder v. Jones,* 465 U.S. 783, 788-89 (1984). As the Supreme Court wrote in *Burger King,* "a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Burger King,* 471 U.S. at 476.

Once it has been decided that a defendant purposefully has established contacts within the forum state, those contacts may be evaluated in light of other factors to determine, in the final analysis, whether the exercise of jurisdiction would be compatible with "fair play and substantial justice." *Id.* (quoting *International Shoe,* 326 U.S. at 320). In this respect, the court, when appropriate, "may evaluate the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of [the underlying dispute], and the shared interest of the several States in furthering fundamental substantive social policies." *Id.* at 477 (internal quotation marks omitted). When the defendant's minimum contacts with the forum are relatively weak (although existent), these considerations may militate in favor of the exercise of jurisdiction. *See id.*[10]

---

[10] These factors rarely will justify a determination against personal jurisdiction. Usually, noted the Supreme Court in *Burger*

(continued...)

In addition to these general rules governing specific jurisdiction, the Supreme Court has given us significant guidance with respect to the application of these rules in contractual matters. First, contracting with an out-of-state party alone cannot establish automatically sufficient minimum contacts in the other party's home forum. *See Burger King,* 471 U.S. at 478. Instead, we are directed to adopt a "highly realistic" approach and to place the contract in the context of the entire transaction of which it is a part. *See id.* at 479 (internal quotation marks omitted). Thus, we must take into account prior negotiations, contemplated future consequences, the terms of the contract and the parties' course of actual dealing with each other. *See id.* It is these factors and this perspective that ought to guide the judicial inquiry as to whether the defendant purposefully has established minimum contacts within the forum.

We also must keep in mind that the judicial evaluation of personal jurisdiction based on minimum contacts must take place in the construct mandated by the rules of procedure. In the federal courts, the judicial approach to considering a question of personal jurisdiction is well established. "[A] complaint need not include facts alleging personal jurisdiction." *Steel Warehouse of Wisconsin, Inc. v. Leach,* 154 F.3d 712, 715 (7th Cir. 1998). However, once the defendant moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, the plaintiff

---

[10] (...continued)
*King*, these considerations may be accommodated through consideration of means other than jurisdiction. For example, the application of choice of law rules can usually provide an adequate means of reconciling social policies of another state and a change of venue can often mitigate adequately significant inconvenience to the defendant.

bears the burden of demonstrating the existence of jurisdiction. *See Central States, S.E. & S.W. Areas Pension Fund v. Reimer Express World Corp.,* 230 F.3d 934, 939 (7th Cir. 2000); *Steel Warehouse,* 154 F.3d at 715; *RAR, Inc. v. Turner Diesel, Ltd.,* 107 F.3d 1272, 1276 (7th Cir. 1997).[11]

The precise nature of the plaintiff's burden depends upon whether an evidentiary hearing has been held. When the district court holds an evidentiary hearing to determine jurisdiction, the plaintiff must establish jurisdiction by a preponderance of the evidence. *See Hyatt Int'l Corp. v. Coco,* 302 F.3d 707, 713 (7th Cir. 2002); *see also Youn v. Track, Inc.,* 324 F.3d 409, 417 (6th Cir. 2003). However, when the district court rules on a defendant's motion to dismiss based on the submission of written materials, without the benefit of an evidentiary hearing, as the district court did here, the plaintiff "need only make out a *prima facie* case of personal jurisdiction." *See Hyatt,* 302 F.3d at 713; *see also Weidner*

---

[11] Indiana courts have held that "the defendant bears the burden of proving the lack of personal jurisdiction by a preponderance of the evidence, unless the lack of jurisdiction is apparent on the face of the complaint." *Anthem Ins. Cos., Inc. v. Tenet Healthcare Corp.*, 730 N.E.2d 1227, 1231 (Ind. 2000); *see also American Econ. Ins. Co. v. Felts*, 759 N.E.2d 649, 654 (Ind. Ct. App. 2001); *N. Texas Steel Co., Inc. v. R.R. Donnelley & Sons Co.*, 679 N.E.2d 513, 519 (Ind. Ct. App. 1997). However, the proper allocation of the burden of proof for purposes of personal jurisdiction in the federal courts is not controlled by state law in diversity cases. *See Mountaire Feeds, Inc. v. Agro Impex, S.A.*, 677 F.2d 651, 653 n.3 (8th Cir. 1982). As stated by our colleagues in the Eighth Circuit, "[i]t is by now well-settled that the party seeking to invoke the jurisdiction of a federal court has the burden of establishing that jurisdiction exists, and the burden may not be shifted to the party challenging the jurisdiction." *Id.* (internal quotation marks omitted).

*Communications, Inc. v. H.R.H. Prince Bandar Al Faisal*, 859
F.2d 1302, 1306 n.7 (7th Cir. 1988); *Nelson v. Park Indus., Inc.,*
717 F.2d 1120, 1123 (7th Cir. 1983) (stating that a court may
receive and weigh affidavits to determine whether it has
personal jurisdiction and that, during this preliminary
proceeding, "the burden of proof is met by a prima facie
showing that personal jurisdiction is conferred under the
relevant jurisdictional statute"). In evaluating whether the
prima facie standard has been satisfied, the plaintiff "is
entitled to the resolution in its favor of all disputes concern-
ing relevant facts presented in the record." *Nelson*, 717 F.2d
at 1123; *see also RAR,* 107 F.3d at 1275 (stating that the
plaintiff "is entitled to have any conflicts in the affidavits
resolved in its favor").

Other circuits follow essentially the same approach,
requiring the plaintiff to establish a prima facie case of
personal jurisdiction over the defendant.[12] Decisions from

---

[12] *See, e.g., Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 647 (8th
Cir. 2003) ("To defeat a motion to dismiss for lack of personal
jurisdiction, the nonmoving party need only make a prima facie
showing of jurisdiction."); *Quick Techs., Inc. v. Sage Group PLC*,
313 F.3d 338, 343 (5th Cir. 2002) ("When the district court rules on
a motion to dismiss for lack of personal jurisdiction without an
evidentiary hearing, the plaintiff may bear his burden by pre-
senting a prima facie case that personal jurisdiction is proper.")
(internal quotation marks omitted); *United States v. Swiss Ameri-
can Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001) ("When a district
court rules on a motion to dismiss for lack of personal jurisdiction
without holding an evidentiary hearing, as in this case, the 'prima
facie' standard governs its determination."); *Myers v. Bennett Law
Offices*, 238 F.3d 1068, 1071 (9th Cir. 2001) ("When personal
jurisdiction is challenged by motion as an initial response, and
the [district] court determines that it will receive only affidavits
(continued...)

other circuits also tend to emphasize that, once the defen-
dant has submitted affidavits or other evidence in opposi-
tion to the exercise of jurisdiction, the plaintiff must go
beyond the pleadings and submit affirmative evidence
supporting the exercise of jurisdiction.[13] These cases also
make clear that, under the prima facie standard, the plaintiff
is entitled to have any conflicts in the affidavits (or support-
ing materials) resolved in its favor.[14] With these principles
in mind, we turn to the case before us.

---

[12] (...continued)
or affidavits plus discovery materials, these very limitations
dictate that a plaintiff must make only a prima facie showing of
jurisdictional facts through the submitted materials in order to
avoid a defendant's motion to dismiss.") (internal quotation
marks omitted).

[13] *See, e.g., Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th
Cir. 2002) ("Where, as here, the defendant submits affidavits to
the contrary, the burden traditionally shifts back to the plaintiff
to produce evidence supporting jurisdiction unless those affi-
davits contain only conclusory assertions that the defendant is
not subject to jurisdiction."); *Swiss American Bank*, 274 F.3d at
619 ("The prima facie showing must be based upon evidence
of specific facts set forth in the record. To meet this requirement,
the plaintiff must go beyond the pleadings and make affirma-
tive proof.") (internal quotation marks and citation omitted).

[14] *See Meier*, 288 F.3d at 1269 ("Where the plaintiff's complaint
and supporting evidence conflict with the defendant's affidavits,
the court must construe all reasonable inferences in favor of the
plaintiff."); *Swiss American Bank*, 274 F.3d at 619 ("[I]n evaluating
whether the prima facie standard has been satisfied, the district
court is not acting as a factfinder; rather, it accepts properly
supported proffers of evidence by a plaintiff as true and makes
its ruling as a matter of law.") (internal quotation marks omitted).

PRF places great emphasis on its contention that, simply by purchasing the PRF-Sterling contract, SSBO France has subjected itself to specific jurisdiction in Indiana. PRF reasons that, because Sterling was subject to personal jurisdiction in Indiana based on its contractual relationship with PRF, SSBO France also is subject to personal jurisdiction because the contacts of a predecessor-in-interest corporation are imputed to a successor-in-interest corporation for purposes of personal jurisdiction. SSBO France takes another view. It submits that it cannot be considered to stand in the shoes of Sterling for purposes of personal jurisdiction. It reasons that, although it assumed Sterling's surviving contractual obligations to PRF, it is not Sterling's corporate successor because it obtained ownership of less than the sum total of Sterling.

PRF is correct in stating that several courts have recognized that the jurisdictional contacts of a predecessor corporation may be imputed to its successor corporation without offending due process. *See Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 654 (5th Cir. 2002) ("[A] successor corporation that is deemed to be a 'mere continuation' of its predecessor corporation can be bound by the predecessor corporation's voluntary submission to the personal jurisdiction of a court."); *Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1131 (10th Cir. 1991) ("A corporation's contacts with a forum may be imputed to its successor if forum law would hold the successor liable for the actions of its predecessor.").[15] The Fifth Circuit in *Patin* explained that the rationale for such a rule is that, because

---

[15] *See also Select Creations, Inc. v. Paliafito America Inc.*, 852 F. Supp. 740, 765 (E.D. Wis. 1994) ("If a court has personal jurisdiction over the predecessor in interest, once successor liability is established, personal jurisdiction over the successor in interest necessarily exists.").

the two corporations "are the *same entity*, the jurisdictional contacts of one *are* the jurisdictional contacts of the other for the purposes of the *International Shoe* due process analysis." *Patin*, 294 F.3d at 653.

SSBO France does not take issue with these cases. Rather, it maintains that these authorities do not control the situation before us because SSBO France is not a corporate successor. SSBO France contends that it is more appropriately characterized as the assignee of certain intellectual property rights sold by Sterling. It further contends that, because it is not the successor-in-interest to Sterling, it would be unfair to impute to it the contacts that Sterling had with Indiana in a significantly different stage in the contractual relationship.

Whether an assignee of a contract necessarily assumes the assignor's contacts with the forum state for purposes of personal jurisdiction is not an issue that has confronted many courts. Notably, however, the courts that have done so have recognized the distinction made by SSBO France and have determined that an assignee does not step automatically into the shoes of the assignor for purposes of personal jurisdiction. *See Russellville Steel Co., Inc. v. Sears, Roebuck & Co.*, No. 99 C 485, 2000 WL 91680, at *3 (N.D. Ill. Jan. 19, 2000) ("The fact that the assignor can be sued in the forum state does not necessarily mean that the assignee can be sued there."); *Lobatto v. Berney*, No. 98 CIV 1984 SWK, 1999 WL 672994, at *8 (S.D.N.Y. Aug. 26, 1999) ("Jurisdiction over an assignee must be based on the assignee's own acts and does not arise solely because the assignor may be subject to personal jurisdiction."); *Rogers v. 5-Star Mgmt., Inc.*, 946 F. Supp. 907, 913 (D.N.M. 1996) ("[A] [c]ourt should determine its personal jurisdiction over an assignee independently of its personal jurisdiction over the assignor."). In reaching that result, these courts have relied

upon two points. First, as a general proposition, " '[e]ach defendant's contacts with the forum State must be assessed individually.'" *Rogers*, 946 F. Supp. at 913 (quoting *Calder v. Jones*, 465 U.S. 783, 790 (1984)). Second, " 'the unilateral activity of parties other than the non-resident defendant cannot satisfy the requirement of the defendant's contacts with the forum state.'" *Id.* (quoting *Barry v. Mortgage Servicing Acquisition Corp.,* 909 F. Supp. 65, 74 (D.R.I. 1995) (citing *Burger King*, 471 U.S. at 474)).

Given the Supreme Court's emphasis on the need for an individual assessment of a particular defendant's contacts with the forum state, the distinction between a corporate successor and an assignee of a contract is a sound one. In the corporate successor context, the successor corporation has chosen to stand in the shoes of its predecessor and has chosen to accept the business expectations of those who have dealt previously with that predecessor. Therefore, it can be expected to be haled into the same courts as its predecessor. An assignee does not have the same relationship with the entities that contracted with the assignor. Rather, it purchases certain specific contractual rights and assumes certain specific obligations. Because due process generally requires that each defendant's contacts with the forum state be assessed individually, a general rule that imputes the assignor's forum contacts to the assignee would, at least in some cases, violate the established norms of due process.

We do not believe that the record before us permits the conclusion that SSBO France is a "mere continuation" of Sterling. It did not merge with Sterling, nor did it purchase all (or substantially all) of Sterling's assets. In our view, it is far more accurate to regard SSBO France as having purchased particular assets of Sterling. We therefore must determine whether, with respect to those assets, PRF has

established that SSBO France should have had the expectation that it could be haled into a court situated in Indiana with respect to these property rights.

In characterizing SSBO France as a corporate successor, PRF has little difficulty in establishing that Sterling's contacts with Indiana under the PRF-Sterling Agreement would render Sterling amenable to suit in Indiana. "While an out-of-state party's contract with an in-state party is not enough alone to establish the requisite minimum contacts, 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing' may indicate the purposeful availment that makes litigating in the forum state foreseeable to the defendant." *Hyatt*, 302 F.3d at 716 (quoting *Burger King*, 471 U.S. at 479). Sterling made the deliberate decision to contract with an Indiana resident in furtherance of its pharmaceutical business. The Agreement was negotiated in Indiana and provided for the application of Indiana law. At the time of its formation, the Agreement clearly "envisioned continuing and wide-reaching contacts" between Sterling and PRF in Indiana. *Burger King*, 471 U.S. at 480. The Agreement contemplated not only that a substantial portion of the research would be conducted by Purdue scientists in West Lafayette, but also that Sterling personnel would travel to Indiana on a semi-regular basis in order to monitor and evaluate the progress of the sponsored research. In furtherance of the Agreement, Sterling regularly shipped research samples to Dr. Rossmann and his associates in Indiana for their analysis. Also, Sterling scientists and employees actually made several visits to Purdue's campus in West Lafayette to discuss and evaluate the progress of PRF's research. In addition to these physical visits by Sterling personnel, Sterling established and maintained ongoing communications with PRF through use of mail, telephone,

facsimile and other means of communication. Based on these contacts, it is evident that Sterling "purposefully established minimum contacts" within Indiana. *Burger King*, 471 U.S. at 476.

As we already have noted, we believe that we must regard SSBO France not as a corporate successor but as the assignee of certain property rights of Sterling. When we thus limit our focus only to *SSBO France's* contacts with the state, PRF makes only a feeble attempt to justify the exercise of personal jurisdiction over SSBO France. In assessing this situation, we employ the approach outlined in *Burger King*. Essentially, we must assess the contractual situation and ask whether, at the time SSBO France purchased these property rights of Sterling or indeed at any time thereafter but before the commencement of this action, SSBO France so structured its business affairs that it reasonably could have predicted that it would be answerable in a court situated in Indiana for its actions with respect to these transactions. When we undertake this assessment, it becomes clear that, *on the record it made in this case*, PRF has failed to establish this proposition.

SSBO France, as opposed to Sterling, did not solicit or negotiate a contract with an Indiana resident in connection with the development of pleconaril. Although SSBO France acquired such a contract from Sterling through an asset purchase agreement, we note that the negotiations between Sterling and SSBO France took place in France and New York and that SSBO France acquired the Agreement only as a part of Sterling's larger ethical pharmaceutical business, not as an individually negotiated assignment. The fact that part of Sterling's ethical pharmaceutical business was derived from a contract that had been substantially per-formed in Indiana by an Indiana resident was of no con-sequence to SSBO France.

Additionally, although PRF has presented evidence that Sterling made several visits to West Lafayette to discuss and to evaluate the progress of Dr. Rothmann's and his associates' research under the Agreement, PRF has presented absolutely no evidence that SSBO France entered Indiana in furtherance of the contract. Of course, SSBO France's lack of presence in Indiana in connection with this contractual relationship is not outcome determinative of the jurisdictional issue in itself. The courts have "never held that the lack of presence in the forum state is determinative of the lack of jurisdiction." *Heritage House Rests., Inc. v. Continental Funding Group, Inc.*, 906 F.2d 276, 283 (7th Cir. 1990). Indeed, "jurisdiction 'may not be avoided merely because the defendant did not *physically* enter the forum State' where the commercial defendant's 'efforts are purposefully directed toward residents of' that state." *Id.* (quoting *Burger King*, 471 U.S. at 476). However, there are other considerations, including the complete lack of evidence regarding any course of actual dealing between SSBO France and PRF, that lead us to believe that SSBO France did not purposefully direct its commercial efforts toward Indiana.

Chief among these considerations is that PRF has made no attempt to establish that, at the time the contract was assigned to SSBO France or at any time thereafter, the business relationship between Sterling and PRF continued to call for or contemplated the active participation of SSBO France in research efforts within Indiana. Indeed, insofar as this record discloses, PRF's research obligations under the contract had been substantially performed by the time of the assignment of the contract to SSBO France. This point was confirmed by counsel at oral argument. PRF has made no serious effort to indicate how SSBO France could have foreseen the necessity of having the same contact with Indiana as had been required of Sterling at an earlier stage

of the contractual relationship. PRF makes no argument that SSBO France purchased an agreement that contemplated additional developmental work in Indiana.

Although choice of law provisions may be some indication that a defendant purposefully has availed itself of the protection of the laws of a particular jurisdiction, *see Burger King,* 471 U.S. at 482, this factor is entitled to less weight in a case such as this one in which the assignee did not negotiate the choice of law provision, *see Rogers,* 946 F. Supp. at 912. More fundamentally, there is no indication that, when SSBO France took over the contract, there was any reason for it to believe that acceptance of a contractual right governed by Indiana law would necessarily lead to litigation in the courts situated in Indiana. Indeed, several other factors made it quite reasonable for SSBO France to give comparatively little weight to the choice of law clause. Notably, the underlying contract, although containing a choice of law clause, did not contain a forum selection clause. Even when PRF and Sterling initially entered into the Agreement and the need for collaboration on the research effort was understood to be a part of the parties' mutual obligation, they did not provide that any lawsuit arising out of the relationship would necessarily be resolved in Indiana. If Sterling did not provide for litigation to occur in Indiana at the commencement of the relationship, we cannot say that its assignee, SSBO France, necessarily would regard such a contingency as a viable one. SSBO France, in examining the contract and assessing its business exposure, undoubtedly would note that the contract clearly foresaw the contingency that Sterling might sell its contractual rights. Notably, although providing for such a transfer, the contract in no way provided for PRF to have any say in the location of the purchaser.

Based on the totality of these considerations, we must conclude that PRF has failed to make a prima facie showing of specific jurisdiction over SSBO France. The record simply will not support the conclusion that SSBO France purposefully availed itself of the benefits of conducting business in Indiana with respect to this litigation.

## B. General Jurisdiction

Having determined that SSBO France's contacts with Indiana relating to this litigation are insufficient to establish specific jurisdiction, we briefly consider PRF's alternative argument that SSBO France's other contacts with the forum are sufficient to support the exercise of general jurisdiction.

Unlike specific jurisdiction, general jurisdiction allows a defendant to be sued in the forum regardless of the subject matter of the litigation. *See Logan Prods., Inc. v. Optibase, Inc.,* 103 F.3d 49, 52 (7th Cir. 1996). However, the constitutional requirement for general jurisdiction is "considerably more stringent" than that required for specific jurisdiction. *United States v. Swiss American Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001) (internal quotation marks omitted); *see also ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 623 (4th Cir. 1997) ("[T]he threshold level of minimum contacts to confer general jurisdiction is significantly higher than for specific jurisdiction."). General jurisdiction is permitted only where the defendant has "continuous and systematic general business contacts" with the forum. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416 (1984); *see also Hyatt Int'l Corp. v. Coco,* 302 F.3d 707, 713 (7th Cir. 2002); *RAR, Inc. v. Turner Diesel, Ltd.,* 107 F.3d 1272, 1277 (7th Cir. 1997). These contacts must be so extensive to be tantamount to SSBO France being constructively present in the state to

such a degree that it would be fundamentally fair to require it to answer in an Indiana court in *any* litigation arising out of *any* transaction or occurrence taking place *anywhere* in the world.[16] Purdue suggests no basis that would permit us to draw such a conclusion.

PRF makes two arguments with respect to general jurisdiction: (1) that SSBO France's contacts with Eli Lilly, an Indiana resident, are sufficient to establish continuous and systematic contacts with Indiana, and (2) that SSBO France is subject to personal jurisdiction under the stream of commerce theory because SSBO France knows and intends for its products to reach Indiana.[17]

---

[16] *See Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000) (General jurisdiction "requires that the defendant's contacts be of the sort that approximate physical presence."); *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997) (General jurisdiction requires a "showing that the defendant has continuous and systematic contacts with the forum state sufficient to justify the state's exercise of judicial power with respect to any and all claims the plaintiff may have against the defendant.").

[17] PRF also contends that SSBO France is subject to general jurisdiction in Indiana based on the contacts of its wholly-owned subsidiary, SSBO U.S. PRF concedes that, as a general rule, the jurisdictional contacts of a subsidiary corporation are not imputed to the parent. *See Central States, S.E. & S.W. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943-44 (7th Cir. 2000); *Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1293 (11th Cir. 2000); *Dickson Marine Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999); *Szakacs v. Anheuser-Busch Cos., Inc.*, 644 F. Supp. 1121, 1125 (N.D. Ind. 1986); *Anthem Ins. Cos., Inc. v. Tenet Healthcare Corp.*, 730 N.E.2d 1227, 1240 n.17 (Ind. 2000).
(continued...)

As to PRF's first contention, it suffices to say that SSBO France's contacts with Eli Lilly in Indiana are not so continuous and systematic that SSBO France could reasonably foresee being haled into court in Indiana for any matter. *See Int'l Med. Group, Inc. v. American Arbitration Ass'n, Inc.,* 312 F.3d 833, 846 (7th Cir. 2002). The record reflects that SSBO France has entered into several confidentiality agreements with Eli Lilly and made a few visits to Indiana in furtherance of these agreements; such a collaborative effort with a single Indiana-based corporation is simply insufficient to satisfy the demanding standard set forth by the Supreme Court of the United States in *Helicopteros.*[18]

---

[17] (...continued)

However, PRF submits that this case presents an exception to the general rule because SSBO France exerts greater than normal control over SSBO U.S. and because SSBO U.S. acts as an agent for SSBO France. *See Anthem,* 730 N.E.2d at 1240 n.17 ("Although the contacts of a subsidiary may be aggregated with the contacts of the parent to achieve personal jurisdiction over the parent, this is only possible in the narrow instances '[w]here a parent utilizes its subsidiary in such a way that an agency relationship can be perceived . . . [or] the parent has greater control over the subsidiary than normally associated with common ownership and directorship or where the subsidiary is merely an empty shell.'") (quoting *Wesleyan Pension Fund, Inc. v. First Albany Corp.,* 964 F. Supp. 1255, 1261 (S.D. Ind. 1997)). We disagree. "Parents of wholly owned subsidiaries necessarily control, direct, and supervise the subsidiaries to some extent." *IDS Life Ins. Co. v. SunAmerica Life Ins. Co.,* 136 F.3d 537, 540 (7th Cir. 1998). PRF has not demonstrated that SSBO France exerts an unusually high degree of control over SSBO U.S. Nor has PRF shown that SSBO U.S.'s corporate existence is simply a formality and that SSBO U.S. is merely SSBO France's agent.

[18] We note that the district court granted SSBO France's motion to dismiss before the close of discovery. However, we need not

(continued...)

In regard to the second contention, PRF's reliance on the stream of commerce theory is misplaced because that theory is relevant only to the exercise of specific jurisdiction; it provides no basis for exercising general jurisdiction over a nonresident defendant. *See Alpine View Co. Ltd. v. Atlas Copco AB,* 205 F.3d 208, 216 (5th Cir. 2000) ("We have specifically rejected a party's reliance on the stream-of-commerce theory to support asserting general jurisdiction over a nonresident defendant.").[19] Because PRF does not allege that it was injured by a product that was placed into

---

[18] (...continued)
determine whether this was an abuse of discretion because PRF's treatment of this contention on appeal is perfunctory. PRF simply states: "PRF sought additional detail regarding these contacts through a 30(b)(6) deposition of [SSBO] France and a motion to compel. The District Court inexplicably failed to rule on that motion to compel. Had [SSBO] France been ordered by the District Court to answer questions regarding its contacts with Indiana[,] Eli Lilly in particular, the record before this Court would be even more vivid." Appellant's Br. at 26-27. Our precedent makes clear that an argument not developed or supported by legal authority on appeal is waived. *See United States v. Jones,* 224 F.3d 621, 626 (7th Cir. 2000); *Spath v. Hayes Wheels Int'l-Indiana, Inc.,* 211 F.3d 392, 397 (7th Cir. 2000); *Thompson v. Boggs,* 33 F.3d 847, 854 (7th Cir. 1994).

[19] *See also Pennzoil Prods. Co. v. Colelli & Assocs., Inc.,* 149 F.3d 197, 203 (3d Cir. 1998) ("[C]ourts have developed the 'stream of commerce' theory by which specific jurisdiction is asserted over a nonresident defendant."); *Barone v. Rich Bros. Interstate Display Fireworks Co.,* 25 F.3d 610, 612 (8th Cir. 1994) ("[T]his case requires us to take another look at a type of specific jurisdiction (as opposed to general jurisdiction), that has been labeled 'stream of commerce.'") (internal citation omitted); *Boone v. Oy Partek AB,* 724 A.2d 1150, 1156 (Del. Super. Ct. 1997) ("The stream of commerce theory . . . rests on a specific rather than general jurisdiction rationale.").

the stream of commerce through SSBO France's distribution channel, PRF cannot rely on the stream of commerce theory to establish jurisdiction over SSBO France. *See World-Wide Volkswagen,* 444 U.S. at 297 (stating that, if the sale of a product "arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others"). Accordingly, there is no basis for exercising general jurisdiction over SSBO France.

### Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*