In the

# United States Court of Appeals
## For the Seventh Circuit

No. 17-2900

CHARLES CURRY, doing business as
GET DIESEL NUTRITION,

*Plaintiff-Appellant*,

*v.*

REVOLUTION LABORATORIES, LLC,
et al.,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cv-02283 — **Matthew F. Kennelly**, *Judge*.

ARGUED SEPTEMBER 11, 2019 — DECIDED FEBRUARY 10, 2020

Before RIPPLE, ROVNER, and BARRETT, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Charles Curry brought this action
pro se[1] in the district court, alleging that Revolution Labora-

---

[1] We appointed Professor Allan Erbsen of the University of Minnesota
Law School faculty to serve as amicus curiae to argue for the reversal of

(continued … )

tories, LLC ("Revolution"), Rev Labs Management, Inc. ("Management"), and Joshua and Barry Nussbaum (collectively the "defendants") had infringed and diluted his trademark,[2] violated the Illinois Consumer Fraud and Deceptive Practices Act, violated the Illinois Uniform Deceptive Trade Practices Act, engaged in false advertising and cyber-squatting, and filed a fraudulent trademark application.[3]

Revolution is a limited liability company that is in the business of selling sports nutritional supplements and apparel. Management is a corporation that was formed for the sole purpose of being the manager of Revolution. According to Mr. Curry, Joshua and Barry Nussbaum co-founded Revolution and Management. Joshua Nussbaum is the President of Management and Revolution; Barry Nussbaum is

---

( … continued)

the judgment of the district court. We thank Professor Erbsen for his excellent brief and oral argument.

[2] Mr. Curry asserted trademark infringement claims falling under both the Lanham Act, 15 U.S.C. § 1125, and common law.

[3] The district court had subject matter jurisdiction over Mr. Curry's four claims "arising under" federal statutes related to trademarks and unfair competition. *See* 28 U.S.C. §§ 1331, 1338(a)–(b). With regard to Mr. Curry's remaining three claims for fraud, unfair competition, and trademark infringement arising under state law, amicus counsel for Mr. Curry submits that subject matter jurisdiction exists over those claims as well because the state and federal claims share a "common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966), and they are part of the "same case or controversy." 28 U.S.C. § 1367(a). We agree. Thus, the district court had supplemental jurisdiction over the state claims. *See Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir. 1995) ("A loose factual connection between the claims is generally sufficient.").

the Director of Management and the Chief Executive Officer of Revolution.

The defendants moved to dismiss Mr. Curry's suit for lack of personal jurisdiction. The district court dismissed the action, holding that it lacked personal jurisdiction.[4] Mr. Curry timely appealed that decision to this court.[5] We respectfully disagree with the district court's ruling and hold that the district court did have personal jurisdiction over Revolution. Accordingly, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

## I.

## BACKGROUND

### A. Facts

Charles Curry is the founder and Chief Executive Officer ("CEO") of a company named "Get Diesel Nutrition" that sells dietary supplements to fitness enthusiasts and athletes. Mr. Curry contends that the "essence" of his brand is "Die-

---

[4] The district court did not consider Mr. Curry's theory that specific personal jurisdiction existed over the other defendants under the doctrine of piercing the corporate veil because the district court had held that Revolution's contacts were insufficient to justify the exercise of specific personal jurisdiction. Mr. Curry also contended that personal jurisdiction existed over Joshua Nussbaum based on the allegedly fraudulent trademark application that Joshua filed with the United States Patent and Trademark Office ("USPTO"). The district court noted that the application was filed in Virginia, not Illinois, and held that it could not be used to establish jurisdiction in Illinois. R.47 at 11.

[5] We have jurisdiction pursuant to 28 U.S.C. § 1291.

sel."[6] Indeed, he has adopted the alter ego "Chuck Diesel," and his company name, website address, and the product at issue, Diesel Test, all contain the word "Diesel."[7] He has paid for advertising for his products, including Diesel Test, in nationally distributed fitness magazines since 2002. He first manufactured Diesel Test in March 2005 and has advertised the product since June 2005.[8] Diesel Test received awards from *Planet Muscle* magazine in 2015 and 2016.

In October 2016, the defendants began to sell the product that is at the heart of Mr. Curry's complaint; the defendants' product is a sports nutritional supplement branded Diesel Test Red Series, All Natural Testosterone Booster. Like Mr. Curry's Diesel Test product, the defendants' product comes in red and white packaging with right-slanted all-caps typeface bearing the words "Diesel Test."

In November 2016, Mr. Curry received a message on Facebook from a consumer alerting him of an online "ESPN" article touting the defendants' product.[9] Mr. Curry alleges that the article is "fake" and was designed to advertise the defendants' product and to "be identical in appearance to the real website [and] to make web visitors believe they are in fact on the official website of ESPN."[10] Confused consum-

---

[6] Appellant's Br. 6.

[7] *Id.*

[8] R.1 ¶ 14. The parties do not dispute that Mr. Curry has sold his Diesel Test product, although we could not find the date of his first sale in the record.

[9] *Id.* at ¶ 35, 29, 59–64.

[10] *Id.* at ¶ 35.

ers began sending Mr. Curry emails requesting free trials of the defendants' product or asking for refunds because they were dissatisfied with the product and mistakenly believed the product came from Mr. Curry.

The defendants admittedly sold their product exclusively online through the following websites: (1) www.revlabs.com; (2) www.boostedtestforyou.com; (3) www.amazon.com; and (4) www.ebay.com.[11] Although the defendants did not sell their product until 2016, they claimed in advertisements that their product was ranked "Best Product and Number 1" in 2015.[12] The defendants have not denied that they concocted a fake ESPN news webpage and created a fake ESPN article touting their product. The defendants conducted all their marketing and advertising for their product through the Internet. In just over seven months, they received more than $1.6 million in gross sales from their product.[13] At least 767 of the sales were to consumers in Illinois.[14]

Mr. Curry promptly demanded that the defendants cease and desist selling their product. The defendants responded

---

[11] R.35-1 ¶¶ 26–27. Mr. Curry alleges that the defendants sold their Diesel Test product on various other websites, R.1 ¶ 25, but the defendants, through the affidavit of Joshua Nussbaum, contend that Revolution's sales were exclusively made through only these four websites and that Revolution was not affiliated with, nor had it ever advertised or sold its product on, the other websites cited by Mr. Curry. R.35-1 ¶¶ 27–28.

[12] R.1 ¶ 37; *Id.* at 63.

[13] R.44-1 ¶ 6.

[14] *Id.* ¶ 7.

and said that they wished to find an "amicable resolution."[15] On November 15, Mr. Curry sent a second email to Revolution in which he renewed his claims and instructed them to contact his attorney. Two weeks later, however, Joshua Nussbaum, President of Revolution, filed a trademark application for the Diesel Test mark to be used in connection with dietary and nutritional supplements. In the trademark application, Mr. Nussbaum, as signatory, declared that "[he] believes that to the best of [his] knowledge and belief, no other persons … have the right to use the mark in commerce."[16] He further indicated on the application that the "filing base" was "Intent to Use."[17] At the time he filed this application, however, the defendants already were selling their product in commerce bearing the Diesel Test mark.

On December 9, 2016, Mr. Curry filed a federal trademark application for the Diesel Test mark for dietary and nutritional supplements indicating that he had first used the mark in commerce in April 2005.[18] The United States Patent and Trademark Office ("USPTO") suspended the processing of both applications, citing a likelihood of confusion between the defendants' and Mr. Curry's marks.

---

[15] R.1 at 43.

[16] R.1 at 49.

[17] *Id.*

[18] As amicus counsel correctly notes, federal law protects trademarks even if the owner has not yet sought federal registration. Appellant's Br. 9 n.2. It is not clear from the record whether Mr. Curry obtained registration.

### B. Procedural History

Mr. Curry filed a pro se complaint alleging the following claims against the defendants: (1) a violation of the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1 (Counts I and II); (2) a violation of Section 1125(a) of the Lanham Act, 15 U.S.C. § 1125, for false designation of origin and false advertising (Count III); (3) a violation of Section 1125(c) of the Lanham Act, 15 U.S.C. § 1125(c), for trademark dilution by tarnishment (Count IV); (4) a violation of common law trademark protections (Count V); (5) a violation of Section 1125(d) of the Lanham Act, otherwise known as the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) (Count VI); and (6) a violation of 15 U.S.C. § 1120, for filing a fraudulent trademark application (Count VII).

The defendants moved to dismiss for lack of personal jurisdiction, relying on affidavits. Joshua and Barry Nussbaum submitted these affidavits on behalf of themselves as well as Revolution and Management.[19] In these affidavits, they denied knowing about Mr. Curry's Diesel Test product before they began selling their own version in 2016.[20] They also denied "see[ing] any advertisements for products sold by [Mr. Curry] until this lawsuit was filed."[21] The defendants

---

[19] R.35-1 ¶ 6; R.35-2 ¶ 7.

[20] R.35-1 ¶ 33; R.35-2 ¶ 21.

[21] R.35-1 ¶ 34; R.35-2 ¶ 22.

further denied "know[ing] that [Mr. Curry] was located in Illinois until this lawsuit was filed."[22]

According to these affidavits, "Revolution does not hold itself out to do business in Illinois" on its website.[23] Although Revolution lists on its website several companies where its products can be purchased, none of the listed companies are located in Illinois. It is not disputed that the defendants (1) are not registered to do business and do not have a registered agent in Illinois; (2) do not have a place of business in Illinois, a telephone, or a mailing address in Illinois; (3) do not have any employees located in Illinois or any who have traveled to Illinois for business; (4) do not have any real or personal property in Illinois; and (5) have never attended any trade shows or participated in any business-related meetings in Illinois.

Further, Barry Nussbaum asserted that he has never "been involved in the marketing, sale, distribution, or manufacturing of any of the products sold by Revolution" despite being its CEO.[24] Joshua Nussbaum admits that he "learned of [Mr. Curry's] claimed trademark … through a Facebook message sent by [Mr. Curry] to Revolution on November 13, 2016."[25]

Although Mr. Curry did not submit a counter-affidavit in response to the defendants' affidavits, he did file a response

---

[22] R.35-1 ¶ 36; R.35-2 ¶ 23.

[23] R.35-1 ¶ 19.

[24] R.35-2 ¶ 17.

[25] R.35-1 ¶ 35.

to the defendants' motion to dismiss in which he submitted additional evidence. For example, Mr. Curry provided evidence that Revolution's "fully interactive website … makes available various dietary supplements with shipping options that include the possibility to select Illinois as a ship to state."[26] Mr. Curry also stated that the "[d]efendants have shipped and sold their counterfeit DIESEL TEST to Illinois residents."[27] Consumers in Illinois who order from Revolution's website receive a written acknowledgement of their Illinois shipping address and a note saying, "Thank you again for your business."[28] In their reply, the defendants contended that despite these contacts, jurisdiction was not proper. Specifically, the defendants contended that jurisdiction was not proper over Revolution because, "[w]hile Revolution does have some minimal sales to Illinois, those sales represent only 1.8% of Revolution's total gross sales nationwide."[29]

Without a hearing, the district court granted the motion to dismiss. Later, it denied Mr. Curry's Rule 59(e) motion. Specifically, the district court held that it (1) could not exercise general jurisdiction over any of the defendants; and (2) could not exercise specific jurisdiction over Revolution. Because Revolution's own contacts were insufficient, the dis-

---

[26] R.22 at 11; R.22-2 at 2–3.

[27] R.22 at 16; R.22-2 at 5 (exhibit showing a package from Revolution bearing a shipping label with Mr. Curry's Illinois address and the words "Diesel Test").

[28] R.22-3 at 1.

[29] R.44 at 5.

trict court declined to determine whether it could exercise specific jurisdiction over (1) Management under the doctrine of piercing the corporate veil; and (2) Barry and Joshua Nussbaum based on theories of fiduciary shield and piercing the corporate veil.[30]

This appeal followed.

## II.

## DISCUSSION

### A.

We review the denial of personal jurisdiction de novo. *See uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 424 (7th Cir. 2010). The court will "take the plaintiff's asserted facts as true and resolve any factual disputes in its favor." *Id.* at 423–24. The plaintiff need not include facts alleging personal jurisdiction in the complaint, but "once the defendant moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the existence of jurisdiction." *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). "The precise nature of the plaintiff's burden depends upon whether an evidentiary hearing has been held." *Id.* Where, as here, the district court ruled on the defendant's motion to dismiss "without the benefit of an evidentiary hearing, the plaintiff bears only the burden of

---

[30] The district court also rejected Mr. Curry's contention that specific jurisdiction existed over Joshua Nussbaum based on the allegedly fraudulent trademark application that he filed with the USPTO because the application was filed in Virginia and had no relationship with Illinois. R.47 at 11–12.

making a prima facie case for personal jurisdiction." *uBID*, 623 F.3d at 423.

When affidavits regarding the issue of personal jurisdiction are submitted, the district court may weigh the affidavits. However, "[i]n evaluating whether the prima facie standard has been satisfied, the plaintiff 'is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record.'" *Purdue Research*, 338 F.3d at 782 (quoting *Nelson v. Park Indus., Inc.*, 717 F.2d 1120, 1123 (7th Cir. 1983)). Thus, this court will accept as true any facts in the defendants' affidavits that do not conflict with anything in the record, either by way of Mr. Curry's complaint or other submissions. Where there is a factual conflict between the record and the defendants' affidavits, we will resolve them in Mr. Curry's favor.

## B.

With the proper standard of review in mind, we proceed to the issue of personal jurisdiction.

Because this case involves claims under both federal law and state law, the district court's jurisdiction rested on a federal question, 28 U.S.C. § 1331, and supplemental jurisdiction, 28 U.S.C. § 1367. In a case involving federal question jurisdiction, "a federal court has personal jurisdiction over the defendant if either federal law or the law of the state in which the court sits authorizes service of process to that defendant." *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010). The only federal statute under which Mr. Curry brings his claims is the Lanham Act, which does not authorize nationwide service of process. *See be2 LLC v. Ivanov*, 642

F.3d 555, 558 (7th Cir. 2011). Thus, "a federal court sitting in Illinois may exercise jurisdiction over [the defendants] in this case only if authorized both by Illinois law and by the United States Constitution." *Id.* (citing Fed. R. Civ. P. 4(k)(1)(A)). The Illinois long-arm statute provides that "[a] court may also exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2-209(c). We have held that "the Illinois long-arm statute permits the exercise of jurisdiction to the full extent permitted by the Fourteenth Amendment's Due Process Clause." *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). Thus, the question we must answer is whether the exercise of personal jurisdiction over the defendants "comports with the limits imposed by federal due process." *Walden v. Fiore*, 571 U.S. 277, 283 (2014); *Mobile Anesthesiologists*, 623 F.3d at 443 (noting that "there is no operative difference between" the constitutional limits of the Illinois Constitution and the United States Constitution in terms of subjecting a defendant to personal jurisdiction).

"The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). Notions of personal jurisdiction traditionally have been based on the defendant's territorial presence within the adjudicating forum. The Supreme Court held in *Pennoyer v. Neff*, 95 U.S. 714, 733 (1877), *overruled in part by Shaffer v. Heitner*, 433 U.S. 186 (1977), that an adjudicating court's jurisdiction over persons is established only when the persons have some territorial presence, actual or constructive, in the forum. *See id.* (establishing four tradi-

tional bases for jurisdiction: territorial service of process, seizure of the defendant's property in the forum state, citizenship, and consent). Judgments made involving persons not satisfying one of the territorial bases for jurisdiction, the Court explained, would violate "due process of law." *Id.*

The Supreme Court, through a series of decisions in the century following *Pennoyer*, significantly eroded the long-standing territorial-based jurisdiction test. *See Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014). "The *Pennoyer* rules generally favored nonresident defendants by making them harder to sue." *Shaffer v. Heitner*, 433 U.S. 186, 200 (1977). The territorial approach became problematic with "[t]he advent of automobiles" and "the concomitant increase in the incidence of individuals causing injury in States where they were not subject to in personam actions under *Pennoyer*." *Id.*; *see Hess v. Pawloski*, 274 U.S. 352 (1927). To address the rising numbers of out-of-state drivers who were not subject to in personam actions, states enacted statutes that either required express consent from the drivers or asserted implied consent to personal jurisdiction in cases arising out of the drivers' use of the states' roads. *See Hess*, 274 U.S. at 356–57 ("[T]he state may declare that the use of the highway by the nonresident is the equivalent of the appointment of the registrar as agent on whom process may be served."). The Court thus modified *Pennoyer*'s territorial limits on jurisdictional powers "by use of a legal fiction that left the conceptual structure established in *Pennoyer* theoretically unaltered." *Shaffer*, 433 U.S. at 202.

The territorial-based approach established in *Pennoyer* was strained even further as corporations increasingly engaged in multi-state commerce. Courts began to assess

whether a corporate entity was "doing business" in the forum state. *See, e.g., Int'l Harvester Co. of Am. v. Kentucky*, 234 U.S. 579 (1914). The "doing business" analysis, however, was still very much territorial-based. *Id.* at 589 ("We are satisfied that the presence of a corporation within a state necessary to the service of process is shown when it appears that the corporation is there carrying on business in such sense as to manifest its presence within the state, although the business transacted may be entirely interstate in its character."). Case law "became cluttered with decisions as to what constituted 'doing business'" as courts "drew fine lines"[31] which made it "quite impossible to establish any rule from the decided cases." *Hutchinson v. Chase & Gilbert, Inc.*, 45 F.2d 139, 142 (2d Cir. 1930).

"With doctrine in so bad a state of disrepair, … *International Shoe Co. v. Washington* afforded the Court an opportunity to begin to set its house in order in this field."[32] *International Shoe* is regarded as a "pathmarking"[33] decision because it moved away from the territorial approach and held that courts may exercise jurisdiction over a defendant even if he were "not present within the territory of the forum" as long as "he ha[d] certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe*, 326 U.S.

---

[31] Philip B. Kurland, *The Supreme Court, the Due Process Clause, and the In Personam Jurisdiction of State Courts*, 25 U. Chi. L. Rev. 569, 584–85 (1958).

[32] *Id.* at 586.

[33] *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).
Such "minimum contacts" fall into two categories, the Court
explained. The first category, which is relevant in the appeal
before us, focuses on the sufficiency of the defendant's con-
tacts with the forum that "also give rise to the liabilities sued
on."[34] *Id.* at 317. In the opinions following *International Shoe*,
this became known as specific jurisdiction, *see, e.g.*, *Bris-
tol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773,
1779–80 (2017), and "specific jurisdiction has become the
centerpiece of modern jurisdiction theory," *Goodyear Dunlop
Tires Operations, S.A. v. Brown*, 564 U.S. 915, 925 (2011) (quot-
ing Mary Twitchell, *The Myth of General Jurisdiction*, 101
Harv. L. Rev. 610, 628 (1988)). Specific jurisdiction "depends
on an 'affiliatio[n] between the forum and the underlying
controversy,' principally, activity or an occurrence that takes
place in the forum State and is therefore subject to the State's
regulation." *Goodyear*, 564 U.S. at 919 (alteration in original)
(citation omitted).

---

[34] The second category of minimum contacts is where the defendant's
"continuous … operations within a state were thought so substantial and
of such a nature as to justify suit against it on causes of action arising
from dealings entirely distinct from those activities." *Int'l Shoe Co. v.
Washington*, 326 U.S. 310, 318 (1945). This is referred to as general juris-
diction, because the defendant's contacts need not be related to the un-
derlying claim. *See Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137
S. Ct. 1773, 1779–80 (2017). Because Mr. Curry does not contend on ap-
peal that the district court had general jurisdiction over the defendants,
our analysis will focus solely on the issue of specific jurisdiction. *See* Ap-
pellant's Br. 49–52; Appellees' Br. 19.

Decades later, in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980), the Supreme Court held that, where the defendants, an automobile wholesaler and a retailer, had no contacts with Oklahoma besides "the fortuitous circumstance that a single Audi automobile [of the defendants], sold in New York to New York residents, happened to suffer an accident while passing through Oklahoma," minimum contacts did not exist so as to permit Oklahoma courts to exercise specific jurisdiction over the defendants consistent with due process. *Id.* at 295. The Court explained that "[t]he concept of minimum contacts, in turn, can be seen to perform two related, but distinguishable, functions." *Id.* at 291–92. One function is that "it acts to ensure that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *Id.* at 292. [35] The other function is that it "pro-

---

[35] The Supreme Court later clarified that this first function

> must be seen as ultimately a function of the individual liberty interest preserved by the Due Process Clause. That Clause is the only source of the personal jurisdiction requirement and the Clause itself makes no mention of federalism concerns. Furthermore, if the federalism concept operated as an independent restriction on the sovereign power of the court, it would not be possible to waive the personal jurisdiction requirement: Individual actions cannot change the powers of sovereignty, although the individual can subject himself to powers from which he may otherwise be protected.

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 n.10 (1982).

tects the defendant against the burdens of litigating in a distant or inconvenient forum." *Id.*

This second function is achieved by ensuring that "maintenance of the suit 'does not offend traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe*, 326 U.S. at 316) (internal quotation marks omitted). Relevant factors include the inconvenience to the defendant, the "forum State's interest in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and "the shared interest of the several States in furthering fundamental substantive social policies." *Id.* The Due Process Clause thus provides "a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *Id.* at 297.

The Supreme Court subsequently made clear that (1) the relationship among the defendant, the forum, and the litigation must arise out of contacts that the "defendant *himself*" creates with the forum state, and (2) the defendant will not be "haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or third person," rather, there must be some "purposeful availment" by the defendant. *Burger King*, 471 U.S. at 475 (citations omitted) (internal quotation marks omitted). In *Burger King*, the Court observed that "[j]urisdiction … may not be avoided merely because the defendant did not *physically* enter the forum State. … [I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire

communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Id.* at 476.

In the last decade, the Supreme Court has confirmed that the inquiry into specific jurisdiction has not changed. *See Walden*, 571 U.S. at 291; *see Advanced Tactical Ordnance Sys. v. Real Action Paintball, Inc.*, 751 F.3d 796, 801 (7th Cir. 2014). In *Walden*, the Supreme Court held that a Nevada court could not exercise personal jurisdiction over a defendant Georgia police officer where no part of the officer's allegedly tortious conduct occurred in Nevada. The plaintiffs had residences in both California and Nevada and provided California identification. *Id.* at 280. As they arrived in Atlanta on their flight from San Juan, the officer, who had been tipped off by a law enforcement officer at the San Juan airport, met the plaintiffs at their departure gate for their flight to Las Vegas and questioned them as to why they were carrying almost $97,000 in cash in their carry-on bags. The officer seized the cash and informed the plaintiffs that the funds would be returned to them if the funds came from a "legitimate source." *Id.* The plaintiffs then boarded their connecting flight to Las Vegas.

The plaintiffs filed suit against the officer in a Nevada court, and the court dismissed the action, concluding that "even if [the officer] caused harm to [the plaintiffs] in Nevada while knowing they lived in Nevada, that fact alone did not confer jurisdiction." *Id.* at 281. A divided panel of the United States Court of Appeals for the Ninth Circuit reversed, holding that the officer "expressly aimed" his conduct at Nevada because he knew "it would affect persons with a 'significant connection' to Nevada." *Id.* at 282.

In reversing the Ninth Circuit, the Supreme Court emphasized that "[d]ue process limits on the State's adjudicative authority principally protect the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties." *Id.* at 284. Thus, the Court has "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State." *Id.* Additionally, the "minimum contacts" analysis requires courts to look at "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* at 285.

The Court also clarified that its prior holding in *Calder v. Jones*, 465 U.S. 783 (1984), was "largely a function of the nature of the libel tort" that was involved, because the "crux of *Calder* was that the reputation-based 'effects' of the alleged libel connected the defendants to California, not just to the plaintiff." *Walden*, 571 U.S. at 287. In *Calder*, an actress filed a libel suit in a California state court against a reporter and an editor, both of whom worked for the National Enquirer in Florida, based on an article they had written about her. The Supreme Court held that the California court could exercise jurisdiction over the defendants consistent with due process because their "intentional, and allegedly tortious, actions were expressly aimed at California." *Calder*, 465 U.S. at 789. The Court identified the following forum contacts: "[t]he article was drawn from California sources, and the brunt of the harm, in terms both of [the plaintiff's] emotional distress and the injury to her professional reputation, was suffered in California," in addition to the nearly 600,000 copies that were distributed in California. *Id.* at 785, 788–89.

The plaintiffs in *Walden* contended that they, like the actress in *Calder*, "suffered the 'injury' caused by [the officer's] allegedly tortious conduct (*i.e.*, the delayed return of their gambling funds) while they were residing in the forum." *Walden*, 571 U.S. at 289. The Court disagreed, explaining that "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id.* at 290. In *Walden*, the plaintiffs "lacked access to their funds in Nevada not because anything independently occurred there, but because Nevada is where [the plaintiffs] chose to be at a time when they desired to use the funds seized" by the officer. *Id.* In contrast, in *Calder*, "the reputational injury caused by the defendants' story would not have occurred but for the fact that the defendants wrote an article for publication in California that was read by a large number of California citizens," and, "because publication to third persons is a necessary element of libel, the defendants' intentional tort actually occurred *in* California." *Id.* at 287–88 (internal citation omitted). It was this unique connection to the forum state that "sufficed to authorize the California court's exercise of jurisdiction." *Id.* at 288.

## C.

We now apply the principles articulated by the Supreme Court to the case before us.[36] This task does not require that

---

[36] Our analysis will focus on whether the district court can exercise specific jurisdiction over Revolution consistent with due process, because the district court did not make specific rulings regarding any of the other defendants. *See Tamburo v. Dworkin*, 601 F.3d 693, 701 (7th Cir. 2010) ("*[E]ach* defendant must have purposely established minimum contacts

(continued … )

we break new ground. Indeed, our course is well charted; our own cases implementing the Supreme Court's precedent offer a well-marked channel. These cases have distilled three "essential requirements" for the exercise of specific jurisdiction over an out-of-state defendant:

> First, the defendant's contacts with the forum state must show that it "purposefully availed [itself] of the privilege of conducting business in the forum state or purposefully directed [its] activities at the state. Second, the plaintiff's alleged injury must have arisen out of the defendant's forum-related activities. And finally, any exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice.

*Lexington Ins. Co. v. Hotai Ins. Co., Ltd.*, 938 F.3d 874, 878 (2019) (alterations in original) (quoting *Felland v. Clifton*, 682 F.3d 665, 673 (7th Cir. 2012)). We also note that, although Revolution's sales of the allegedly infringing product to Illinois consumers all took place through either its interactive website or a third party's website, we consistently have declined "to fashion a special jurisdictional test for Internet-based cases." *Tamburo*, 601 F.3d at 703 n.7. "[W]e think that the traditional due process inquiry … is not so difficult to apply to cases involving Internet contacts that courts need

---

( … continued)

with the forum state such that he or she should reasonably anticipate being haled into court there.") (emphasis added) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)).

some sort of easier-to-apply categorical test." *Illinois v. Hemi Grp. LLC*, 622 F.3d 754, 759 (7th Cir. 2010).

**1.**

We first examine whether Revolution's activity can be characterized as purposefully directed at Illinois, the forum state. Revolution has no physical presence in Illinois. Our cases make clear, however, that physical presence is not necessary for a defendant to have sufficient minimum contacts with a forum state. Indeed, we have noted that the "purposeful-direction inquiry 'can appear in different guises.'" *Tamburo*, 601 F.3d at 702 (quoting *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008)). The essential point of the inquiry is to "ensure that an out-of-state defendant is not bound to appear to account for merely 'random, fortuitous, or attenuated contacts' with the forum state." *Dudnikov*, 514 F.3d at 1071 (quoting *Burger King*, 471 U.S. at 475).

The principal approach employed to ensure that a defendant's contacts with a state are not random, fortuitous, or attenuated is to inquire whether the record demonstrates that the defendant has "'purposefully directed'" his activities at a forum even in the "absence of physical contacts" with a forum. *Burger King*, 471 U.S. at 476 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774–75 (1984)). Such "purposeful direction" may be shown by evidence that the defendant's actions, even if initiated outside of the forum state, nevertheless were directed at the forum state. For example, a defendant may cause its product to be distributed in the forum state. *See, e.g.*, *Keeton*, 465 U.S. at 774–75 (finding purposeful direction where defendant published magazines outside the forum state and circulated them in the fo-

rum state).[37] Among our recent cases, *Hemi* is particularly instructive. There, the State of Illinois sued Hemi Group LLC ("Hemi") for selling cigarettes to Illinois residents in violation of state law and for failing to report the sales in violation of federal law. Hemi was based in New Mexico; it "[wa]s not incorporated or organized under Illinois law, it [wa]s not registered to do business in Illinois, it d[id] not have any offices or employees in Illinois, it d[id] not bank in Illinois, and it ha[d] not advertised in print media in Illinois." *Hemi*, 622 F.3d at 755–56. Hemi sold its cigarettes through its websites, and the complaint identified only one Illinois resident, a special senior agent of the Illinois Department of Revenue, who had purchased cigarettes from Hemi through its websites. This agent had purchased over three hundred packs of cigarettes from Hemi over the course of two years. *Id.* at 755.

We held that Hemi's contacts with Illinois were sufficient to support personal jurisdiction in that state. We based our decision in part on Hemi's maintenance of "commercial websites through which customers could purchase cigarettes, calculate their shipping charges using their zip codes, and create accounts." *Id.* at 757–58. Because Hemi "knowingly did do business with Illinois residents … [,] Hemi's argument that it did not purposefully avail itself of doing business in Illinois [rang] particularly hollow." *Id.* at 758.

---

[37] The Supreme Court has held that an out-of-state insurer who sold only a single policy within the state is subject to personal jurisdiction within the state at least with respect to a cause of action related to that policy. *See McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 222 (1957).

We are satisfied that Revolution has formed sufficient minimum contacts with Illinois. Like Hemi, Revolution sells its products only online through its website and third-party websites. Revolution's interactive website for the sale of its products requires the customer to select a shipping address. Illinois is among the "ship-to" options from which the customer must choose. Illinois residents purchasing Revolution's products also receive an email from Revolution thanking them for their business, confirming their order, and listing the Illinois shipping address. Revolution admittedly sold its Diesel Test product to 767 Illinois residents between October 14, 2016, and June 1, 2017.

Revolution's own actions in establishing these commercial contacts with Illinois fairly can be described as purposeful. Preparing to engage in commercial activity, Revolution created an interactive website and explicitly provided that Illinois residents could purchase its products through that website. It further arranged for the sale of its products through third-party websites. After the sales, Revolution sent written confirmation to the Illinois customers acknowledging their sale and including their Illinois shipping address, and, finally, Revolution shipped Diesel Test to its customers who were in Illinois. *See Hemi*, 622 F.3d at 758; *uBid*, 623 F.3d at 428 (stating that defendant's argument that its sales to Illinois residents were merely "automated transactions unilaterally initiated by those residents" was not persuasive because those "customers … are not simply typing their credit card numbers into a web form and hoping they get something in return"; the defendant "itself set the system up this way").

In the face of this sales arrangement, it is not persuasive to say that Revolution did not exploit the Illinois market simply because its advertising was not especially aimed at that state. *See uBid*, 623 F.3d at 428–29. There is no per se requirement that the defendant especially target the forum in its business activity; it is sufficient that the defendant reasonably could foresee that its product would be sold in the forum. *See Keeton*, 465 U.S. at 781. In *Keeton*, the Supreme Court upheld the exercise of personal jurisdiction even though the defendant magazine publisher had not targeted specifically the forum. The Court determined that, with a nationwide market, the publisher reasonably should have anticipated that it could be held accountable in the forum state for activities arising from the "substantial number" of sales in the forum state.[38] *Id.* In *Hemi*, we concluded that personal jurisdiction was proper irrespective of the fact that Hemi "ha[d] not advertised in print media in Illinois." *Hemi*, 622

---

[38] The Court of Appeals, in affirming the district court's dismissal of the plaintiff's complaint, "observed that the 'single publication rule' ordinarily applicable in multistate libel cases would require it to award [the plaintiff] 'damages caused in *all* states' should she prevail in her suit, even though the bulk of [the plaintiff's] alleged injuries had been sustained outside New Hampshire." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 773 (1984). The Supreme Court nevertheless held that there was "no unfairness" in haling the magazine publisher into New Hampshire to respond to the libel action filed against it based on the contents of its magazine where it had sold "a substantial number of copies" of the magazine in that state. *Id.* at 781.

F.3d at 756. Revolution's nationwide advertisements were accessible in Illinois.[39]

Significant caution is certainly appropriate when assessing a defendant's online contacts with a forum "to ensure that a defendant is not haled into court simply because the defendant owns or operates a website that is accessible in the forum state." *Hemi*, 622 F.3d at 760. Here, however, Revolution's 767 sales of Diesel Test to Illinois residents provides solid evidence that Revolution has "purposely exploited the Illinois market." *be2*, 642 F.3d at 558 (collecting cases). These sales certainly distinguish Revolution from "the defendant [that] merely operates a website, even a 'highly interactive' website, that is accessible from, but does not target, the forum state." *Id.* at 559 (collecting cases).

## 2.

The proper exercise of specific jurisdiction also requires that the defendant's minimum contacts with the forum state be "*suit-related*." *Advanced Tactical*, 751 F.3d at 801 (quoting *Walden*, 571 U.S. at 284). There must be a "connection between the forum and the specific claims at issue." *Bristol-Myers Squibb*, 137 S. Ct. at 1781. "[E]ven regularly occurring sales of a product in a State do not justify the exercise of jurisdiction over a claim unrelated to those sales." *Goodyear*, 564 U.S. at 931 n.6.

Revolution submits that Mr. Curry has failed to establish adequately that a connection exists between Revolution's sales to consumers in Illinois and his claims against Revolu-

---

[39] R.35-1 ¶ 26 (the defendants' admission that Revolution marketed and advertised Diesel Test on the Internet).

tion. It maintains that our decision in *Advanced Tactical* supports this contention.[40] *Advanced Tactical*, like this case, involved trademark infringement claims. Advanced Tactical Ordnance Systems, a manufacturer of "PepperBall-branded" projectile irritants, sued Real Action Paintball, Inc., a California company, for trademark infringement in the District Court for the Northern District of Indiana. Advanced Tactical alleged that Real Action infringed its trademark rights in the "PepperBall" mark by using it in a misleading statement that Real Action posted on its website and sent to everyone on its email list.

Advanced Tactical contended that personal jurisdiction was proper in Indiana because Real Action had sent emails to customers located in Indiana and because Real Action "had made at least one sale to an Indiana resident." *Advanced Tactical*, 751 F.3d at 799.

---

[40] We note that, unlike the situation in *Advanced Tactical Ordnance Sys. v. Real Action Paintball, Inc.*, 751 F.3d 796 (7th Cir. 2014), in which an evidentiary hearing was held, the district court decided the personal jurisdiction issue in this case without an evidentiary hearing. "The precise nature of the plaintiff's burden depends upon whether an evidentiary hearing has been held." *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). Where an evidentiary hearing is held, the plaintiff must establish jurisdiction by a preponderance of the evidence. *Id.* Where, as here, the district court ruled on the motion to dismiss based only on the submission of written materials, Mr. Curry may satisfy his burden by simply establishing a prima facie case. *Id.*

We held that Advanced Tactical failed to establish personal jurisdiction. Real Action's email to its customer list, which included customers in Indiana, could not support jurisdiction because, we explained, any connection between the lawsuit and where the email was opened would be "entirely fortuitous." *Id.* at 803. Although Real Action made at least one sale to an Indiana resident, Advanced Tactical did not provide evidence that the sale had any connection to the underlying claims of trademark infringement. No evidence, for example, suggested that Indiana residents saw Real Action's email or website before purchasing products from Real Action. "The only sales that would be relevant," we explained, "are those that were related to Real Action's alleged unlawful activity," and Advanced Tactical did "not provide[] evidence of any such sales." *Id.* at 801. We emphasized in *Advanced Tactical* that the defendant's contacts with the forum state must be related to the plaintiff's claims to support specific personal jurisdiction. *Advanced Tactical*, 751 F.3d at 801.

Mr. Curry, on the other hand, certainly has met his burden. Unlike the sales in *Advanced Tactical*, which were made by the defendant in the forum state but were not related to the claims underlying the suit, Mr. Curry has shown that the direct sales that Revolution made in Illinois involved Diesel Test, a product that bears the allegedly infringing trademark that forms the very basis of this action. Mr. Curry submits that Revolution participated in the Illinois market by selling its product in a manner that would lead the consumer to confuse Revolution's product with his. The gravamen of his case is that Revolution's advertisement and sale of its product in the national market caused confusion and consequent-

ly deprived Mr. Curry of the value of his trademark in those states, *including Illinois*, where the product was sold.

Whether Mr. Curry can prove these allegations at trial is not the issue at this stage of the litigation. All he must establish, at this stage, is a prima facie case of specific personal jurisdiction over Revolution, by showing that Revolution established certain minimum contacts with Illinois by purposefully directing its activity at Illinois and availing itself of the benefits of conducting business there, and that these contacts are related to his claims. The defendant's activity in the state is the very activity that allegedly caused the confusion at the heart of this litigation.

*Advanced Tactical* cannot be read as requiring, at this stage of the litigation, anything more. As we have just noted, Revolution's sales are inextricably linked to the alleged tortious activity underlying Mr. Curry's claims. By contrast, the allegations of trademark infringement in *Advanced Tactical* appear to be based solely on statements made on the defendant's website about its affiliations. The sales in the forum state therefore did not have, as the court noted, any relevance to the allegations of the complaint. Notably, *Advanced Tactical* made no attempt to limit our earlier decision in *Hemi*, which had upheld an assertion of personal jurisdiction based on sales of cigarettes to one individual in the forum state.

Revolution's contacts with Illinois are clearly related to the claims in this suit.

**3.**

In the final step of our inquiry, we must ensure that the district court's exercise of jurisdiction "does not offend tradi-

tional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316 (citation omitted) (internal quotation marks omitted). In making this determination, we consider:

> [T]he burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of [the underlying dispute], and the shared interest of the several States in further-ing fundamental substantive social policies.

*Purdue Research*, 338 F.3d at 781 (internal quotation marks omitted) (quoting *Burger King*, 471 U.S. at 477). "When the defendant's minimum contacts with the forum are relatively weak (although existent), these considerations may militate in favor of the exercise of jurisdiction." *Id.* Nevertheless, as long as the plaintiff has made a threshold showing of mini-mum contacts, that showing is generally defeated only where the defendant presents "a compelling case that the presence of some other considerations would render juris-diction unreasonable." *Burger King*, 471 U.S. at 477.

Applying this analysis here, we see no unfairness in sub-jecting Revolution to jurisdiction in Illinois. Revolution is not physically present in the state. Nevertheless, it has struc-tured its marketing so that it can easily serve the state's con-sumers—and it has done so by selling the allegedly confus-ing product in substantial quantity. Revolution has held it-self as conducting business nationwide through both its in-teractive website and other websites. Thus, the burden of re-quiring Revolution to defend a lawsuit in Illinois is minimal. Revolution "wants to have its cake and eat it, too: it wants

the benefit of a nationwide business model with none of the exposure." *Hemi*, 622 F.3d at 760.

Moreover, Illinois has a strong interest in providing a forum for its residents, including Mr. Curry, to seek redress for harms suffered within the state by an out-of-state actor. If the allegations in this case prove to be true, then hundreds of Illinois residents purchased Revolution's Diesel Test product, which is inextricably linked to the claims of this case. "There is no unfairness in requiring [a defendant] to defend [a] lawsuit in the courts of the state where, through the very activity giving rise to the suit, it continues to gain so much." *uBid*, 623 F.3d at 433; *see Hemi*, 622 F.3d at 760 (finding that jurisdiction in Illinois was fair where defendant had established an "expansive, sophisticated commercial venture online," held itself out to conduct business nationwide, and succeeded in reaching customers across the country).

### Conclusion

We reverse the dismissal of claims against Revolution, vacate the dismissal of claims against the other three defendants, and remand the case for further proceedings. Mr. Curry may recover the costs of this appeal.

REVERSED in PART, VACATED in PART and
REMANDED