In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 24-2444

B.D., a minor, by and through
his guardian ad litem, BRYAN MYERS,

*Plaintiff-Appellant,*

*v.*

SAMSUNG SDI CO., LTD.,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:22-cv-00107-MPB-MKK — **Matthew P. Brookman**, *Judge.*

———————————

ARGUED APRIL 16, 2025 — DECIDED JULY 9, 2025

———————————

Before SYKES, *Chief Judge*, and BRENNAN and LEE, *Circuit Judges*.

BRENNAN, *Circuit Judge*. B.D. sued Samsung SDI, a South Korean manufacturer, in Indiana after one of its batteries exploded in his pocket there. The company moved to dismiss B.D.'s complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), which the district court granted. Relevant here, a court may exercise specific personal

jurisdiction over a foreign defendant only when that party has purposefully availed itself of the forum through its in-state contacts, the plaintiff's lawsuit relates to those contacts, and it would otherwise be fair for the court to subject the defendant to its coercive power.

Samsung SDI sells batteries to sophisticated customers for use as components in consumer products, including products widely available across the Hoosier State. The company has thus purposefully availed itself of the Indiana forum by exploiting an end-product stream of commerce. Samsung SDI has not, however, availed itself of the forum through sales of individual batteries—that is, the derivative product. It instead conducts its business to prevent ordinary consumers from purchasing those individual batteries in Indiana.

Still, B.D. received the individual battery that exploded in his pocket after his stepfather purchased it from an e-cigarette retailer through an unauthorized transaction. There is a disconnect, then, between Samsung SDI's purposeful contacts with the Indiana forum, through an end-product stream of commerce, and B.D.'s lawsuit, which stems from a consumer purchase of the derivative product. That disconnect forecloses an exercise of specific personal jurisdiction. We therefore affirm the district court's decision granting Samsung SDI's motion to dismiss.

## I

Where, as here, the parties engaged in jurisdictional discovery but the district court did not hold an evidentiary hearing before resolving a Rule 12(b)(2) motion, the plaintiff must make only a prima facie case for personal jurisdiction. *NBA Props., Inc. v. HANWJH*, 46 F.4th 614, 620 (7th Cir. 2022). When assessing whether the party has carried its burden, we

consider as true the facts alleged in its well-pleaded com-
plaint. *Id.* But we may also rely on each party's written decla-
rations. *B.D. ex rel. Myers v. Samsung SDI Co.*, 91 F.4th 856, 859
(7th Cir. 2024) (per curiam).[1] In the face of a factual dispute,
we construe the record in the plaintiff's favor. *Id.* The facts,
from B.D.'s perspective, follow.

Samsung SDI, a battery manufacturer organized under the
laws of South Korea, maintains its headquarters and principal
place of business in that country. The company conducts busi-
ness internationally, but it does not have a physical presence
in Indiana. No Samsung SDI employees or agents work in that
state, nor is the organization registered to do business there—
or anywhere in the United States for that matter.

Samsung SDI's product offerings include the 18650 lith-
ium-ion battery, which is named for its dimensions. The bat-
tery is 18mm in diameter, 65mm in length, and resembles a
cylinder. The 18650 battery looks like a typical AA battery, but
it holds more power and is rechargeable. And, unlike AA bat-
teries, individual 18650 batteries are not intended for con-
sumer purchase. Samsung SDI instead markets this model
battery only to sophisticated corporate customers.

The company sells millions of batteries annually to these
corporate middlemen. They, in turn, incorporate those batter-
ies into packs. Battery packs combine several individual 18650
batteries into a single encasement. Unlike the individual
18650 battery, batteries encased in a pack are monitored by a
circuit board meant to prevent thermal runaway—a danger-
ous heat cycle that can lead to explosions. Some Samsung SDI

---

[1] The caption of the previous per curiam opinion in this successive
appeal erroneously spelled Myers as "Myer."

customers then sell the battery packs, while others integrate them directly into widely available end products, such as laptops, power drills, and vacuum cleaners. Samsung SDI does not restrict where its customers sell their end products. So, even though the company does not maintain a physical presence in Indiana, its batteries are available to residents across the state as components in consumer products.

Samsung SDI takes steps to ensure its customers use 18650 batteries only for approved purposes. Customers must apply to purchase the individual batteries and disclose to the manufacturer how they plan to utilize them. Each customer must also, as a precondition of sale, acknowledge that 18650 batteries should not be used outside of a pack. The batteries are particularly dangerous when employed outside of a pack to power e-cigarette—or vaping—devices. Such devices are often kept close to a person's body, so the risk of injury from an exploding battery is severe. For that reason, Samsung SDI will not sell 18650 batteries to a customer if its purchase application exposes ties to the e-cigarette industry.

Despite Samsung SDI's efforts, individual, unpackaged 18650 batteries—the derivative product—are nonetheless available to Indiana consumers. People can purchase the batteries from third parties both online and in retail stores. B.D.'s stepfather, Bryan Myers, did just that. According to B.D.'s complaint, Myers purchased one of Samsung SDI's 18650 batteries from an e-cigarette store in Vincennes, Indiana. It remains unclear from the record how the third-party retailer acquired the battery. Regardless, B.D. eventually received it from his stepfather. While he was carrying the battery in his pocket, it exploded. B.D. sustained severe burns and was

hospitalized for three weeks. To address his injuries, doctors had to perform a skin graft.

B.D., through his stepfather, then filed this products liability lawsuit against Samsung SDI in Indiana state court, alleging the exploding 18650 battery was defective. The South Korean company removed the case to federal court based on diversity of citizenship. 28 U.S.C. §§ 1332(a), 1441(b). It then moved to dismiss B.D.'s complaint for lack of personal jurisdiction. FED. R. CIV. P. 12(b)(2). The district court denied the motion. It concluded that B.D. made out a prima facie case for personal jurisdiction.

Samsung SDI appealed. But the record was insufficient to decide whether an Indiana-based court could exercise personal jurisdiction over the foreign defendant. As a result, we remanded the case to the district court with instructions to "permit discovery about Samsung SDI's contacts with Indiana concerning B.D.'s claimed injuries"—facts essential to making a jurisdictional determination. *B.D.*, 91 F.4th at 864.

On remand, the parties conducted additional discovery. Samsung SDI then renewed its motion to dismiss for lack of personal jurisdiction. This time, the district court granted the motion and dismissed the lawsuit. It reasoned that B.D. failed to show Samsung SDI purposefully availed itself of the Indiana forum—a prerequisite to the exercise of personal jurisdiction.

B.D. now appeals. Once again, the sole issue is whether the district court erred in its resolution of Samsung SDI's Rule 12(b)(2) motion. We review de novo whether a plaintiff failed to make a prima facie case for personal jurisdiction. *NBA Props.*, 46 F.4th at 620.

## II

A federal district court sitting in diversity may exercise personal jurisdiction over a foreign defendant to the extent permissible under state law and the Due Process Clause of the United States Constitution. *Lexington Ins. Co. v. Hotai Ins. Co.*, 938 F.3d 874, 878 (7th Cir. 2019) (Barrett, J.); FED. R. CIV. P. 4(k)(1)(A). Indiana's long-arm statute—located in Trial Rule 4.4(A)—and the Due Process Clause are coterminous. *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 799 (7th Cir. 2014); *Boyer v. Smith*, 42 N.E.3d 505, 509 (Ind. 2015). So, our personal jurisdiction analysis collapses into a single inquiry: whether the Constitution permits an exercise of personal jurisdiction here.

From the early days of our Republic, a court's "competence was generally constrained only by the territorial limits of the sovereign that created it." *Mallory v. Norfolk S. Ry.*, 600 U.S. 122, 128 (2023) (plurality opinion) (internal quotation omitted). A court had jurisdiction over a defendant if it could be found within the forum state. *Id.* at 128–29; *Pennoyer v. Neff*, 95 U.S. 714, 733 (1878). This same basic rule "still applies to natural persons today." *Mallory*, 600 U.S. at 129. "Tag jurisdiction," as it is sometimes called, comports with due process now, just as it did in the 18th century. *Burnham v. Superior Ct.*, 495 U.S. 604, 619 (1990).

But early jurisdictional rules based on territorial limits were not always well suited for a developing country and an evolving economy. As corporations began to flourish in the 19th century, "the question arose how to adapt the traditional rule[s] … for individuals to artificial persons created by law." *Mallory*, 600 U.S. at 129. Technological developments allowed organizations to conduct affairs in a state without also

maintaining a physical presence there. A corporation could thus derive an economic benefit from a forum yet avoid being haled into the forum's courts to answer lawsuits related to its in-state business activities. To many, the jurisdictional rules needed to change to meet the modern environment. *See* Robert H. Jackson, *What Price "Due Process"?*, 5 N.Y. L. REV. 435, 438 (1927) ("We do not feel that due process of law should be construed to mean that non-resident traders shall be at liberty to seek our markets and to avoid our courts."). And so they did. Indeed, "the tremendous growth of interstate business activity[] led to an inevitable relaxation of the strict limits on state jurisdiction over nonresident individuals and corporations." *Burnham*, 495 U.S. at 617 (internal quotation omitted).

The Supreme Court's opinion in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), became the "canonical decision" delineating the constitutional limits on a court's exercise of personal jurisdiction over a nonconsenting, foreign defendant. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021). To satisfy due process, a defendant must have sufficient contacts with a forum such that it would "not offend traditional notions of fair play and substantial justice" for that party to be exposed to a court's coercive power there. *Int'l Shoe*, 326 U.S. at 316 (internal quotation omitted). Over time, courts have distilled two types of personal jurisdiction from *International Shoe* and its progeny: general and specific.

A court with general personal jurisdiction over a defendant may hear any claim brought against that party, regardless of whether its activities in the forum relate to the underlying lawsuit. But a defendant is subject to such far-reaching jurisdiction in only a select set of circumstances. Its contacts with the forum, as contemplated in *International Shoe*, must be "so

continuous and systematic as to render [it] essentially at home in the forum." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotation omitted). Courts located in the state where an organization is incorporated, as well as the state where it principally conducts its business, may exercise general personal jurisdiction over a corporate defendant. *Id.* at 924.

Specific personal jurisdiction is of another kind. Courts may exercise this narrower form of jurisdiction over defendants less affiliated with the forum—though only over a correspondingly smaller world of claims. Whether specific personal jurisdiction exists turns on "the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014) (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 775 (1984)). Many courts, including ours, have set forth the specific personal jurisdiction inquiry in a three-prong test. *See, e.g.*, *Lexington Ins.*, 938 F.3d at 878.

First, the defendant must "purposefully avail[] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (citing *Int'l Shoe*, 326 U.S. at 319). "The contacts must be the defendant's own choice and not 'random, isolated, or fortuitous.'" *Ford*, 592 U.S. at 359 (quoting *Keeton*, 465 U.S. at 774). The "unilateral activity of a third party" will not "satisfy the requirement of contact with the forum." *Walden*, 571 U.S. at 291 (internal quotation omitted).

Second, an adequate connection must exist between the defendant's activities in the forum and the underlying lawsuit. Said another way, "the suit must arise out of or relate to" its forum contacts. *Bristol-Myers Squibb Co. v. Superior Ct.*, 582

U.S. 255, 262 (2017) (citation modified). If the defendant's contacts caused the plaintiff's alleged injury, that will, of course, suffice. Yet "a strict causal relationship" is not necessary; a defendant's contacts may "relate to" the lawsuit absent "proof of causation." *Ford*, 592 U.S. at 362. Still, the relatedness inquiry "incorporates real limits" aimed at protecting foreign defendants from being haled into distant courts for claims only tangentially related to their forum contacts. *Id.*

Third and finally, personal jurisdiction must accord with notions of fairness. If the defendant "present[s] a compelling case that the presence of some other considerations would render jurisdiction unreasonable," then the forum court may not exercise it. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

The Supreme Court's specific personal jurisdiction caselaw embodies several principles. To start, it is intimately linked with the "idea of reciprocity between a defendant and a State." *Ford*, 592 U.S. at 360. A company that purposefully avails itself of the benefits of doing business in a forum, including the protection of that state's laws, must also answer for any related misconduct in the forum's courts. *Id.*; *Int'l Shoe*, 326 U.S. at 319. Just so, a defendant owes no reciprocal obligation to a state—and thus cannot be haled into that state's courts—when it has insufficient contacts with the forum or when its contacts do not relate to the plaintiff's lawsuit. In this way, the doctrine reflects a quid pro quo. Importantly, too, these jurisdictional rules are primarily designed to protect defendants foreign to a forum. For that reason, the principle of "fair warning" supports the doctrine. *Ford*, 592 U.S. at 360 (quoting *Burger King*, 471 U.S. at 472). A defendant must have notice or "knowledge that a particular activity may subject it

to the jurisdiction of a foreign sovereign." *Id.* (citation modified). That way, the party can conduct itself in a manner that will allow it "to lessen or avoid exposure to a given State's courts." *Id.* The defendant can, in other words, avert engaging in a quid pro quo with the forum state.

All agree Samsung SDI, a South Korean company, is not subject to general personal jurisdiction in Indiana. Only specific personal jurisdiction is in dispute. But that issue is easier to identify than it is to resolve. Applying the Supreme Court's personal jurisdiction doctrine, as outlined above, has "proven fertile ground for debate by law students, lawyers, and judges alike." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008) (Gorsuch, J.). This case illustrates that debate. Not only did the district court reach opposite conclusions before and after jurisdictional discovery, but courts across the country have split on the question of exercising specific personal jurisdiction over foreign battery manufacturers under similar circumstances. *Compare Ethridge v. Samsung SDI Co.*, 137 F.4th 309 (5th Cir. 2025) (Oldham, J.) (jurisdiction), *Sullivan v. LG Chem, Ltd.*, 79 F.4th 651 (6th Cir. 2023) (same), *LG Chem Am., Inc. v. Morgan*, 670 S.W.3d 341 (Tex. 2023) (same), *and Dilworth v. LG Chem, Ltd.*, 355 So. 3d 201 (Miss. 2022) (same), *with Yamashita v. LG Chem, Ltd.*, 62 F.4th 496 (9th Cir. 2023) (O'Scannlain, J.) (no jurisdiction), *Ethridge*, 137 F.4th at 323–31 (Jones, J., dissenting) (same), *and LG Chem, Ltd. v. Superior Ct.*, 295 Cal. Rptr. 3d 661 (Cal. Ct. App. 2022) (same).

Mindful of this diverging authority and that "[t]he greys"—rather than the black and white—"are dominant" when applying personal jurisdiction doctrine, we consider the facts here under the inquiry's three prongs. *Kulko v.*

*Superior Ct.*, 436 U.S. 84, 92 (1978) (quoting *Estin v. Estin*, 334 U.S. 541, 545 (1948)).

## A

Whether a defendant purposefully availed itself of a particular forum depends on whether it "deliberately reached out beyond its home—by, for example, exploiting a market" there. *Ford*, 592 U.S. at 359 (citation modified). A defendant need not be physically present in a state to have sufficient contacts for jurisdictional purposes. Purposeful availment can, instead, "appear in different guises." *Dudnikov*, 514 F.3d at 1071. Particularly relevant to products liability cases, one of those guises comes in the form of the stream-of-commerce theory.

The Supreme Court first articulated the stream-of-commerce theory in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980). The Court observed that a defendant corporation may purposefully avail itself of a forum when it "delivers its products into the stream of commerce with the expectation that" in-state consumers will purchase those products. *Id.* at 297–98. The circuits have split on the precise contours of this theory. Some have adopted a stream-of-commerce-plus test wherein a corporate defendant cannot purposefully avail itself of a forum by simply placing its products into a distribution system. *See, e.g.*, *Yamashita*, 62 F.4th at 503. Rather, the defendant must target a market by, for example, "creat[ing], control[ling], or employ[ing] the distribution system" that drives the product to the state. *Asahi Metal Indus. Co. v. Superior Ct.*, 480 U.S. 102, 112 (1987) (opinion of O'Connor, J.).

This circuit, however, has adopted a less demanding variant of the stream-of-commerce theory, which we have referred to as the "knowledge version." *B.D.*, 91 F.4th at 861.

Under the knowledge version, a defendant purposefully avails itself of a forum if it "is aware that the final product is being marketed in the forum State." *Asahi*, 480 U.S. at 117 (Brennan, J., concurring in part and concurring in the judgment); *Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 399–400 (7th Cir. 2020) (rejecting a "per se requirement that the defendant especially target the forum in its business activity"); *see also* 4 WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 1067.4 (4th ed.) (collecting cases and discussing the circuit split).

Because Samsung SDI has no physical presence in Indiana, the parties dispute whether, applying the knowledge version, the company was aware its 18650 batteries would reach the forum state through a stream of commerce. Two streams of commerce are at play here, though. The first is an end-product stream of commerce. The second is a derivative-product stream of commerce. Samsung SDI purposefully availed itself of the Indiana forum through the first but not the second.

**1**

Begin with what we call the end-product stream of commerce. Samsung SDI sells its 18650 batteries in bulk to sophisticated customers that eventually incorporate them into battery packs. As described above, battery packs consist of several 18650 batteries and a circuit board designed to prevent thermal runaway. Samsung SDI's customers essentially create a different product by producing these battery packs with all their enhanced safety features. *See Ethridge*, 137 F.4th at 326 (Jones, J., dissenting) ("At the appropriate level of generality" individual batteries and battery packs "are not the same products."). The customers then sell the packs or integrate them into end products.

Samsung SDI does not itself ship 18650 batteries to Indiana. The stream-of-commerce theory, however, "contemplates that a defendant's product may go through middlemen before reaching consumers." *J.S.T. Corp. v. Foxconn Interconnect Tech. Ltd.*, 965 F.3d 571, 576 (7th Cir. 2020) (Barrett, J.). Samsung SDI's corporate representative confirmed that the company's customers include the likes of Black & Decker, HP, and Dell. Those customers rely on battery packs to power their products, including everything from power tools to laptops. The corporate representative explained that, although Samsung SDI limits its customers to those who intend to purchase 18650 batteries for approved uses, it does not limit where its customers distribute their end products. And the record confirms Samsung SDI-powered products are indeed available to consumers across Indiana.

On these facts, we can easily conclude that Samsung SDI delivered its 18650 batteries to nationally recognized businesses, intending for them to be incorporated into packs and, later, end products. The company did so "with the expectation" that those end products would be available to consumers across the country, including in Indiana. *World-Wide Volkswagen*, 444 U.S. at 298. At the least, Samsung SDI knew, or was aware, its batteries would wind up in that state. *Asahi*, 480 U.S. at 117 (Brennan, J., concurring in part and concurring in the judgment); *Curry*, 949 F.3d at 399–400.

So, though Samsung SDI has not reached out directly to Indiana consumers, it has still "deliberately exploited" the Indiana market by leveraging corporate middlemen to funnel 18650 batteries, encased in packs, to the state. *Keeton*, 465 U.S. at 781. In short, Samsung SDI purposefully availed itself of

Indiana insofar as it expected battery packs to reach the forum through its sales of 18650 batteries to sophisticated customers.

**2**

Turn now to the derivative-product stream of commerce. Samsung SDI does not sell individual 18650 batteries directly to consumers because the batteries are not designed to be used outside of a pack. The company takes additional precautions to ensure its batteries are handled safely. It screens its corporate customers to verify they plan to use the batteries only for approved purposes. And, as a precondition of sale, every customer must acknowledge that 18650 batteries "should not be dismantled from the battery pack."

But people may still purchase individual 18650 batteries. This case and others show that the derivative product is available to consumers at third-party vendors, including e-cigarette stores. Yet nothing in the record suggests that Samsung SDI "reached out beyond its home" to sell individual batteries directly to Indiana consumers, either on its own or through middlemen. *Ford*, 592 U.S. at 359 (internal quotation omitted). Quite the opposite. Samsung SDI actively sought to avoid exploiting a stream of commerce that would lead to consumers purchasing individual 18650 batteries.

The purposeful availment inquiry centers on the defendant's deliberate contacts with a forum. *See, e.g.*, *id.*; *Walden*, 571 U.S. at 284; *Burger King*, 471 U.S. at 475. The Supreme Court has repeatedly explained that "the 'unilateral activity of another party or a third person'" does not constitute purposeful availment. *Burger King*, 471 U.S. at 475 (quoting *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 417 (1984)). *World-Wide Volkswagen* is instructive on this point. There, the Court held that Oklahoma courts lacked personal jurisdiction

over a New York-based car dealer and regional distributor. *Worldwide-Wide Volkswagen*, 444 U.S. at 288–89, 295. The defendants conducted no business in Oklahoma, yet they sold a car that was later involved in an accident in that state. *Id.* at 288. Still, the Oklahoma courts could not exercise personal jurisdiction over the defendants in the ensuing products liability lawsuit because it was the actions of third parties alone—the buyers of the car—that caused the vehicle to end up in the forum. *Id.* at 298–99.

Here, the unilateral actions of unknown third parties have made individual 18650 batteries accessible to consumers in Indiana. These third parties have created and exploited a derivative-product stream of commerce. Absent their unilateral actions, individual batteries would not be available to Indiana consumers for purchase. Like *World-Wide Volkswagen*, the third-party forum contacts do not amount to purposeful availment by Samsung SDI. *See id.*

Admittedly, *World-Wide Volkswagen* is not a perfect analogue to this case. As explained, Samsung SDI has sufficient contacts with the forum through an end-product stream of commerce, whereas the defendants in that case did not have sufficient contacts with Oklahoma. But we read *World-Wide Volkswagen* to say that, when analyzing each potential in-state contact, our inquiry focuses on "the defendant's conduct and connection with the forum," rather than those of other actors. *Id.* at 297.

Samsung SDI had no hand in directing individual 18650 batteries to Indiana. In jurisdictional terms, it did not "continuously and deliberately exploit[]" the derivative-product stream of commerce. *Keeton*, 465 U.S. at 781. Third-party actors did.

We pause to acknowledge that, on similar facts, other courts have declined to "granulat[e] … the forum … into distinct market segments when evaluating personal jurisdiction." *See, e.g.*, *Morgan*, 670 S.W.3d at 348; *Sullivan*, 79 F.4th at 672; *Ethridge*, 137 F.4th at 318 ("reject[ing] this 'different markets' understanding of the Fourteenth Amendment"). True, the personal jurisdiction inquiry focuses on a defendant's "affiliation with the *State*," not some artificial subdivision. *See Walden*, 571 U.S. at 286 (emphasis added). But in our view, distinguishing between the end-product stream of commerce and the derivative-product stream of commerce does not amount to dividing the forum. Instead, it accurately differentiates between the types of contacts Samsung SDI has with the forum.

Recall, the stream-of-commerce theory is just one of the "guises" in which purposeful availment can appear. *Dudnikov*, 514 F.3d at 1071; *Curry*, 949 F.3d at 398. It serves as a method of establishing that a defendant has sufficient contacts with a state. Courts routinely differentiate among defendants' forum contacts. *See, e.g.*, *Bristol-Myers Squibb*, 582 U.S. at 258–59 (distinguishing a pharmaceutical company's research and advocacy contacts from its manufacturing contacts); *World-Wide Volkswagen*, 444 U.S. at 295 (separating a car dealer's retail contacts from its more "fortuitous" single-vehicle contacts). Because streams of commerce are types of contacts, courts can differentiate between them, too. And a single forum can implicate two streams of commerce, one of which a defendant deliberately exploits and the other of which it does not. *See Yamashita*, 62 F.4th at 507–08 (differentiating

"consumer product[]" sales and "stand-alone batter[y]" sales in a single forum).[2]

What is more, the Supreme Court has advised defendants that they can "'structure [their] primary conduct' to lessen or avoid exposure to a given State's courts." *Ford*, 592 U.S. at 360 (quoting *World-Wide Volkswagen*, 444 U.S. at 297). Consistent with this advice, courts may differentiate among various contacts—including streams of commerce—to acknowledge a defendant's efforts to do just that. A corporate defendant might reduce its exposure to a forum's jurisdiction by exploiting one stream of commerce but not another. *See Ethridge*, 137 F.4th at 325 (Jones, J., dissenting). That is precisely what Samsung SDI did here.

\*          \*          \*

Samsung SDI has not availed itself of the Indiana forum through the derivative-product stream of commerce. Individual 18650 batteries are available to consumers only because of the unilateral actions of third parties. But the company has availed itself of the Indiana forum through the end-product stream of commerce. It no doubt expected that its batteries would reach the state—yet only encased in packs, as evidenced by how it structured its business activities. "[F]or purposeful availment purposes, a single sufficiently deliberate

---

[2] Because identifying various forum contacts is a routine task in the personal jurisdiction context, we do not share the concern of other courts that distinguishing between streams of commerce would be unworkable. *See, e.g.*, *Ethridge*, 137 F.4th at 319–20 (declining to account for the fact that Samsung SDI sells individual batteries only to sophisticated customers for integration into packs).

contact can suffice," so the first prong of the specific personal jurisdiction is satisfied here. *Yamashita*, 62 F.4th at 504.

**B**

On the second prong, courts assess the relationship between a defendant's purposeful contacts with a forum and the underlying lawsuit. The Supreme Court's "most common formulation of the rule demands that the suit 'arise out of or relate to the defendant's contacts with the forum.'" *Ford*, 592 U.S. at 362 (emphasis omitted) (quoting *Bristol-Myers Squibb*, 582 U.S. at 262).

In *Ford*, the Court explained that this formulation of the rule can be satisfied in two ways. First, personal jurisdiction will lie when a defendant's in-state contacts caused the injury that instigated the lawsuit—that is, when the lawsuit arose out of the defendant's contacts. *Id.* The second sufficient showing requires something short of "a strict causal relationship." *Id.* A plaintiff need only show the suit relates to the defendant's forum contacts. The Supreme Court has provided precious little guidance on how strong the link must be. But it cautioned against an "anything goes" test. *Id.* Rather, the relatedness prong "incorporates real limits" on exercising personal jurisdiction meant "to adequately protect defendants foreign to a forum." *Id.*

Courts must scrutinize the relationship between in-state contacts and lawsuits to police the boundary between the two types of personal jurisdiction. The looser the connection becomes, the more an exercise of specific personal jurisdiction will start to look like one of general personal jurisdiction. And at a certain point, "the core distinction between" the two will "collapse" altogether. *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 866 (D.C. Cir. 2022).

B.D. does not argue that his injury arose directly out of Samsung SDI's forum contacts. Instead, he submits that the company's Indiana-based activities "relate to" his products liability lawsuit to satisfy the second sufficient showing articulated in *Ford*. We disagree.

B.D.'s stepfather purchased the individual 18650 battery that later exploded in B.D.'s pocket at an e-cigarette retail store. The battery was not encased in a pack and was therefore acquired through an unauthorized, derivative-product transaction. The resulting products liability lawsuit thus does not relate to Samsung SDI's deliberate forum contacts. To be sure, both B.D. and Samsung SDI have Indiana affiliations. B.D. resides in the state and his injuries occurred there. And, again, Samsung SDI is affiliated with the forum through the downstream consequences of selling 18650 batteries to sophisticated customers for use as parts. But, fatal to establishing personal jurisdiction here, those independent relationships with Indiana do not overlap with one another.

There is a disconnect between Samsung SDI's purposeful in-state contacts, through an end-product stream of commerce, and B.D.'s lawsuit, which stems from a consumer purchase of an individual battery. Absent the requisite "relationship among the defendant, the forum, and the litigation," personal jurisdiction over Samsung SDI must be lacking. *Walden*, 571 U.S. at 284 (quoting *Keeton*, 465 U.S. at 775).

As explained at the outset, the legitimacy of maintaining specific personal jurisdiction over a nonconsenting, foreign defendant is rooted in reciprocity. "When (but only when) a company exercises the privilege of conducting activities within a state—thus enjoying the benefits and protections of its laws"—may the state "hold the company to account for

related misconduct." *Ford*, 592 U.S. at 360 (citation modified). Here, Samsung SDI does not exercise the privilege of conducting the type of business that led to B.D.'s injury and subsequent lawsuit. That is, it does not sell individual 18650 batteries with the knowledge that they will be used outside of a pack in Indiana. The company accordingly owes Indiana no reciprocal obligation to appear in its courts to defend against B.D.'s allegations, which relate only to that kind of business activity.

Holding otherwise would undermine a related precept of the Supreme Court's personal jurisdiction jurisprudence: notice. A defendant must have "fair warning—knowledge that a particular activity may subject it to the jurisdiction of a foreign sovereign." *Id.* (citation modified). Because Samsung SDI structured its activities to ensure only encased 18650 batteries reached consumers in Indiana, it was not on "clear notice" that it would have to answer for injuries occasioned by consumers obtaining individual batteries—injuries wholly unrelated to the company's in-state activities. *Id.* (quoting *World-Wide Volkswagen*, 444 U.S. at 297).

This would be a closer case if, for example, an 18650 battery exploded in a pack powering a laptop. In that counterfactual, B.D. would have acquired the battery through the end-product stream of commerce that Samsung SDI deliberately exploited. The mismatch between Samsung SDI's purposeful contacts with the forum and B.D.'s lawsuit that forecloses an exercise of personal jurisdiction here would thus disappear. The relationship among the defendant, the forum, and the lawsuit would be stronger. So, B.D. would have a correspondingly better argument that Samsung SDI's reciprocal obligation to appear in an Indiana court to answer for alleged

misconduct attaches under those circumstances. *See id.* And the company would also have fair notice of the lawsuit, as B.D.'s injury would be a downstream consequence of its intentional, forum-based business activities. *See id.* This is not that case, though. The disconnect between Samsung SDI's purposeful contacts with the state through the sale of 18650 batteries as components and B.D.'s injury—the consequence of an unauthorized, individual-battery purchase—precludes the exercise of personal jurisdiction.[3]

B.D. resists this conclusion. As he sees it, no jurisdictional daylight exists between a fact pattern where a consumer purchases an individual 18650 battery that explodes and one where a battery acquired from a pack explodes. According to B.D., in a case like his, Samsung SDI can raise product misuse as a merits defense. In other words, the fact that he obtained an individual 18650 battery even though consumers are not meant to handle individual batteries outside of a pack could allow the company to avoid liability. *See, e.g., Hoffman v. E.W. Bliss Co.*, 448 N.E.2d 277, 283 (Ind. 1983) ("Misuse is a well-recognized defense" to strict products liability.). But, B.D. says, an unauthorized purchase has no bearing on the jurisdictional analysis. *See, e.g., Dilworth*, 355 So. 3d at 208 (supporting the argument that a "consumer's purported misuse of the product may be a valid merits defense," but "it is not an

---

[3] One could also imagine a scenario in which Samsung SDI availed itself of the Indiana forum through the derivative-product stream of commerce—either on its own or by leveraging middlemen. There, the mismatch between the company's deliberate contacts and B.D.'s lawsuit would disappear, too. But as explained, *supra*, there is no evidence that Samsung SDI exploited that stream of commerce here. So, the disconnect remains.

argument that defeats a *prima facie* case of personal jurisdiction"). We cannot agree.

For one, our holding does not depend on B.D.'s misuse of an 18650 battery. Rather, it depends on his stepfather having purchased it in a stream of commerce that Samsung SDI did not deliberately exploit. For another, "[p]ersonal jurisdiction is an essential element of district court jurisdiction, without which the court is powerless to proceed to an adjudication." *Advanced Tactical Ordnance Sys.*, 751 F.3d at 800 (alteration omitted) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999)). Say jurisdictional and merits defenses overlap. The first cannot be circumvented by relying on the possibility that the second may later come into play. *See LG Chem*, 295 Cal. Rptr. 3d at 682.

B.D.'s primary objection to a dismissal, though, focuses on his understanding of the Supreme Court's decision in *Ford*. In that case, two individuals were injured while driving Ford vehicles in their home states of Montana and Minnesota. *Ford*, 592 U.S. at 356. The plaintiffs sued the car manufacturer in their respective home states. Ford moved to dismiss for lack of personal jurisdiction, arguing neither lawsuit related to its forum contacts because it did not design, manufacture, or sell the vehicles at issue in those states. *Id.* at 356–57. "Only later resales and relocations by consumers had brought the vehicles to Montana and Minnesota." *Id.* at 357.

The Supreme Court rejected Ford's arguments and concluded that the courts in each state could exercise specific personal jurisdiction. The company's problem was that it conducted substantial business in both states. "By every means imaginable—among them, billboards, TV and radio spots, print ads, and direct mail—Ford urge[d] Montanans and

Minnesotans to buy its vehicles, including" the model vehicles in which the plaintiffs were injured. *Id.* at 365. The company also "foster[ed] ongoing connections to its cars' owners" in Montana and Minnesota by, for example, providing instate repair services. *Id.* Though it was true the precise cars at issue were not sold or manufactured in those states, "Ford had systematically served a market in Montana and Minnesota for the *very vehicles* that the plaintiffs allege[d] malfunctioned and injured them." *Id.* (emphasis added).

To the Court, Ford's contacts with the states were thus related enough to the lawsuits to support specific personal jurisdiction. *Id.* at 371. It observed that "[w]hen a company … serves a market for a product in a State and that product causes injury in the State to one of its residents, the State's courts may entertain the resulting suit." *Id.* at 355.

In B.D.'s view, if we strictly apply *Ford*, this is an open-and-shut case. Samsung SDI serves the Indiana market because its 18650 batteries reach the state through a stream of commerce. He was injured when that model battery exploded in his pocket. And he is an Indiana resident. *Ford* requires no more, so an Indiana court may exercise personal jurisdiction over Samsung SDI. B.D.'s position finds support in some of our fellow circuits and state courts. *See, e.g.*, *Ethridge*, 137 F.4th at 318 (exercising personal jurisdiction over Samsung SDI because the plaintiff was "a Texas resident, he used his 18650 battery in Texas, and he suffered an injury in Texas" (footnote omitted)); *Morgan*, 670 S.W.3d at 349 (same). With great respect for those decisions, we do not read *Ford* so expansively.

Critical here is the issue the Court in *Ford* did "not address." 592 U.S. at 365. It left for another day a scenario where "Ford marketed the models" involved in each plaintiff's

accident "in only a different State or region." *Id.* It would have been more difficult for the Court to find the plaintiffs' suits related to Ford's forum contacts if they were injured in F-150s but the automaker had not served a market in Montana and Minnesota for that model truck. *See Yamashita*, 62 F.4th at 505–06; *Ethridge*, 137 F.4th at 325–26 (Jones, J., dissenting).

The issue presented here more closely resembles that open question than it does the question resolved in *Ford*. Samsung SDI does not market individual 18650 batteries in Indiana—it expects only batteries encased in packs to reach the state. Yet it was an individual battery that exploded in B.D.'s pocket and led to this lawsuit. Swap vehicles in for batteries and Ford in for Samsung SDI, and the differences between this case and *Ford* emerge. We must decide whether the automaker is subject to personal jurisdiction in Indiana for a consumer-plaintiff's in-state injury in a Ford Explorer when the company sells Explorers only to police departments. *See Yamashita*, 62 F.4th 507–08 (discussing the same analogy). The rationale in *Ford* does not control on these facts. In the counterfactual, Ford would no longer have "systematically served a market" in the forum "for the very vehicle[]" that led to the plaintiff's injury. *Ford*, 592 U.S. at 365. Indeed, the company did not intend for the plaintiff to get behind the wheel of an Explorer.

We doubt the relationship between the lawsuit and Ford's forum contacts is "close enough to support specific jurisdiction" under the hypothetical circumstances. *Id.* at 371; *see also Yamashita*, 62 F.4th at 507–08 (expressing a similar doubt). But of course, those are the circumstances of this case. Substitute back in batteries for vehicles and Samsung SDI for Ford, and we do not think the Supreme Court would consider the

relationship here close enough to support an exercise of specific personal jurisdiction. *See Yamashita*, 62 F.4th at 508.

On B.D.'s contrary reading of *Ford*, if a corporate defendant has *some* sufficient contact with the forum, a court may exercise specific personal jurisdiction so long as the plaintiff resides in the state and is injured there. But that reading downplays the importance of the defendant's forum contacts and gives too much weight to the plaintiff's contacts. Put another way, B.D.'s reading impermissibly shifts the jurisdictional inquiry from defendant focused to plaintiff focused. The Supreme Court has "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff … and the forum." *Walden*, 571 U.S. at 284. Because B.D.'s lawsuit does not relate to Samsung SDI's purposeful contacts with the forum, neither his Indiana residency nor the location of his injury establishes personal jurisdiction.

If we accepted B.D.'s rule by watering down the relatedness requirement and shifting our focus to his contacts, we would blur the distinction between general and specific personal jurisdiction. Time and again, the Supreme Court has cautioned that "a corporation's continuous activity of some sorts within a state is not enough to support the demand that the corporation be amenable to suits unrelated to that activity." *Bristol-Myers Squibb*, 582 U.S. at 264 (citation modified); *Goodyear*, 564 U.S. at 927; *Int'l Shoe*, 326 U.S. at 318. Samsung SDI's sales of 18650 batteries for use in end products, continuous as they may be, cannot support jurisdiction over B.D.'s unrelated lawsuit—not without transforming specific personal jurisdiction into "a loose and spurious form of general jurisdiction." *Bristol-Myers Squibb*, 582 U.S. at 264.

**C**

Assuming a defendant has purposefully availed itself of the forum and the plaintiff's lawsuit relates to the defendant's in-forum contacts, a court must still "determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King*, 471 U.S. at 476 (quoting *Int'l Shoe*, 326 U.S. at 320). Several factors inform that analysis. These include "[t]he burden on the defendant" in having to litigate in a foreign court, "the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of the underlying dispute, and the shared interest of the several States in furthering fundamental substantive social policies." *Curry*, 949 F.3d at 402 (alteration omitted) (quoting *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 781 (7th Cir. 2003)). Because B.D.'s lawsuit does not relate to Samsung SDI's Indiana-based contacts, we need not evaluate this last prong of the jurisdictional inquiry.

**III**

Samsung SDI purposefully availed itself of the Indiana forum but only through an end-product stream of commerce. The company expected its 18650 batteries to reach the state encased in packs. Yet B.D.'s injury occurred when an individual battery—purchased outside of a pack—exploded in his pocket. The relationship between his resulting lawsuit and Samsung SDI's purposeful forum contacts is too attenuated to support an exercise of personal jurisdiction.

AFFIRMED.